2022 UT App 77

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CHRISTOPHER GARCIA,
Appellant.

Opinion
No. 20190832-CA
Filed June 24, 2022

Third District Court, Salt Lake Department
The Honorable Adam T. Mow
No. 171906133

Andrea J. Garland and David Finlayson,
Attorneys for Appellant

Sean D. Reyes and John J. Nielsen,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGE MICHELE M. CHRISTIANSEN FORSTER and JUSTICE DIANA
HAGEN concurred.[1]

ORME, Judge:

¶1 Christopher Garcia appeals his convictions for aggravated sexual abuse of a child. He argues that (1) the trial court erred in admitting evidence of his prior convictions for aggravated sexual abuse of a child; (2) the court plainly erred when it permitted two instances of bolstering of the victim's (Victim) testimony; and

---

1. Justice Diana Hagen began her work on this case as a judge of the Utah Court of Appeals. She became a member of the Utah Supreme Court thereafter and completed her work on this case sitting by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 3-108(4).

(3) the sentencing statute mandating that he serve life in prison without the possibility of parole because he already had a prior conviction of a grievous sexual offense is unconstitutional under both the United States Constitution and the Utah Constitution. We disagree and affirm Garcia's convictions.

BACKGROUND[2]

¶2    In October 2014, Victim's mother (Mother) met Garcia on an online dating website. Mother's profile on the website indicated that she had children. A few days after making contact, the two arranged to meet in person. At their first meeting, Garcia told Mother that he had been convicted for "a drug deal gone wrong and kidnapping," that he had served prison time, and that he was currently living in a halfway house. The two arranged to meet again and eventually began a romantic relationship. Mother then introduced Garcia to her four children, including nine-year-old Victim.

¶3    Garcia and Mother became engaged two months after their initial meeting. Approximately two months later, Garcia asked Mother to be his sponsor because his parents, who had previously acted as his sponsors, were moving out of state. Mother explained at trial that a sponsor "takes on the responsibility of . . . babysitting [Garcia when] he's in public." Mother agreed to take on the role, and as part of the process of Mother becoming Garcia's sponsor, Garcia had to explain his previous charges to Mother in the presence of a therapist.

¶4    In preparation for this step, Garcia revealed to Mother that he had actually served prison time for raping a nine-year-old girl,

---

2. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611.

N.B.—and not for "a drug deal gone wrong and kidnapping." But he told Mother that what was "on paper" was "not what happened." Although he acknowledged having sexual intercourse with N.B., he stated that "she was more mature for her age and she came on to him," that N.B.'s story changed multiple times, and that he pled guilty to three counts of aggravated sexual abuse of a child only because the State was "going to try to give him something worse." Mother believed Garcia and disregarded the contrary information she learned in the documents she was provided and during the meeting with the therapist.

¶5      Mother explained at trial that she knew Garcia, as a condition of his parole, "was not supposed to be around children." Because he was also restricted from being in a romantic relationship with anyone with minor children, Garcia lied to the authorities about his relationship with Mother, telling them that she was his childhood friend and that the two had recently renewed their friendship. Even so, because Mother was a parent to minor children, she was informed during the meeting with the therapist that Garcia was not allowed near her house. Mother disregarded these restrictions, and Garcia continued to visit her home every day as he had done previously.

¶6      After Garcia was injured in the summer of 2015 while riding a bike, he began spending even more time at Mother's home. Instead of going to work, he would stay at the home, where he was frequently alone with Victim while Mother was at work and while Victim's older siblings were at their father's house. Garcia and Victim frequently watched TV in Mother's bedroom on the bed. During that time, Garcia touched Victim's back and hair "a lot." He also "[o]ften" told Victim to turn over on her back and, both over and under her clothing, he would touch her stomach with his hands and "move down" to her vagina. His hands would be "in motion" as he touched both the inside and outside of her vagina. This made Victim feel "[u]ncomfortable," but Garcia would tell her "to get used to it and to be quiet." Garcia also frequently touched Victim's breasts and buttocks both over

and under her clothing. At times, Garcia threatened Victim with a belt to get her to go to Mother's bedroom or bribed her "[t]o kiss and to touch him." When Victim refused, he forced her to do so by pushing or pulling her against him.

¶7 Twice, Garcia touched Victim's vagina with his penis and tried to insert it into her mouth. Victim recalled at trial that this first took place while she was watching her favorite TV show, *Criminal Minds*. She could not recall any details of the second time that Garcia did this. Victim did not disclose the sexual abuse to anyone in her family because Garcia threatened to hurt them if she did. This abuse continued for two years until Mother and Garcia ended their relationship.

¶8 Garcia and Mother's relationship came to an end on Super Bowl Sunday, 2017. That day, Garcia "mooed at [Mother] like a cow." Mother confronted Garcia, and after he laughed at her, she punched him in the face. Mother then drove off in her vehicle and Garcia pursued her in another vehicle. Later seeing that he was "coming at me head-on," Mother swerved and Garcia side-swiped her vehicle. Following police intervention, when Mother received a citation for domestic violence but neither party was arrested, Mother texted Garcia's mother, "Your son's going to prison." Despite wanting Garcia incarcerated, she did not disclose to police that Garcia had violated his parole by being around children. Garcia left the house that day.

¶9 The next day, while Mother was packing Garcia's belongings, she came across the paperwork describing the facts underlying his prior conviction and began reading. Although she had previously reviewed the paperwork in preparation for her meeting with the therapist, she became sick to her stomach and cried. Mother's eldest son and daughter asked why she was crying, and Mother decided to reveal to them the real reason Garcia had served prison time. She told them that Garcia had been convicted of raping a nine-year-old girl and not for "[a] drug deal gone wrong and kidnapping." Both children became upset, and

her son insisted that they ask Victim—who was asleep in her bedroom—whether Garcia had sexually abused her.

¶10 While her older children waited outside the bedroom, Mother entered and woke Victim. Mother then asked Victim whether Garcia "had ever touched her." Victim looked "terrified" and started crying. Mother began repeating, "You're not in trouble, this is not your fault but I need to know." Victim eventually answered, "Yes," and began telling Mother of the sexual abuse she had endured. This conversation lasted between ten to fifteen minutes, at the end of which Mother told Victim, "You're not his only victim, he's done it before," but she did not provide any further details. Following the conversation, Mother contacted Garcia's parole officer, who directed her to call the police. She did so, and a detective then interviewed Victim at the Children's Justice Center.

¶11 The State charged Garcia with three counts of aggravated sexual abuse of a child. Prior to trial, the State provided notice of its intent to introduce evidence of Garcia's prior convictions of aggravated sexual abuse of a child under rule 404(c) of the Utah Rules of Evidence. Garcia moved to bifurcate the trial so that the jury would learn of his prior convictions only if it first found him guilty of the charged crimes and needed to determine, for sentencing purposes, whether he had a prior conviction of a grievous sexual offense. Garcia further moved the court to exclude evidence of his prior convictions under rule 403 of the Utah Rules of Evidence, arguing that the danger of unfair prejudice substantially outweighed its probative value because the acts underlying his prior convictions were too dissimilar to his alleged acts in the present case.

¶12 Following a hearing, the trial court ruled that the State could present evidence of Garcia's prior convictions as part of its case-in-chief, including the testimony of two prior victims, "as well as [Garcia's] prior convictions, sentence, commitment, and parole history." The court determined that the risk of unfair

prejudice did not substantially outweigh the probative value because the evidence was "highly probative" and because a limiting instruction would mitigate the risk of unfair prejudice.

¶13    At trial, N.B. testified that her older sister started dating Garcia nineteen years earlier, when N.B. was nine years old. At the time, N.B. lived with her mother and sister and shared a bedroom with her sister. Garcia eventually moved in with them and shared the same bedroom with N.B. and the sister. The three slept in the same bed initially with the sister in the middle, but at some point, Garcia began sleeping between the sister and N.B. N.B. testified that "little by little [Garcia] started making more and more inappropriate moves" toward her while the sister slept. Garcia began placing his arm around N.B. and over time began moving his hand under her shirt and then under her bra. Garcia progressed to touching N.B.'s vagina, at first over and later under her underwear. Things escalated even further, with Garcia forcing N.B. to perform oral sex on him and Garcia inserting his finger into N.B.'s vagina. Once, while N.B. was sitting on the floor, Garcia discreetly played with her vagina with his toe while other family members were nearby.

¶14    N.B. testified that she was home alone with Garcia the first time he raped her. Sometime between three and five months after Garcia moved into the house, Garcia told N.B. to go to her mother's bedroom where he had laid a towel on the bed. He then pinned N.B. down on the bed with her hands over her head and, while N.B. protested, proceeded to rape her vaginally using a latex glove as an improvised condom. When he finished, he told N.B. to hurry up and clean herself before the sister returned home. Garcia raped N.B. other times when the sister was not home and once while the sister was in the shower.

¶15    The only person to whom N.B. disclosed the sexual abuse was her best friend, B.M., but she asked her not to tell anyone. B.M. initially did as N.B. requested, but she eventually disclosed

the abuse after an incident in which Garcia rubbed her breast during a sleepover at N.B.'s house.

¶16     Toward the end of N.B.'s testimony, the State noted that she was "getting droopy-eyed and . . . appear[ed] to be really tired" and asked whether she had taken any medication prior to testifying. N.B. responded that she had taken Xanax before coming to court and that she otherwise "wouldn't have made it" because she was "having severe panic attacks all morning" at the prospect of testifying. At another point, N.B. stated that because Garcia pled guilty in her case, she had not previously needed to testify against him. N.B. then stated, unprompted, "I was terrified of this part, so this girl"—referring to Victim—"is strong."

¶17     B.M. testified next. She explained that she used to frequently sleep over at N.B.'s house, where she would usually join N.B., Garcia, and the sister in bed. One time, when B.M. was twelve years old, she, N.B., and Garcia were watching TV on the bed. B.M. was sitting at the foot of the bed, N.B. was in the middle, and Garcia was at the head of the bed. After N.B. had fallen asleep, Garcia reached around N.B. and began rubbing B.M.'s left breast over her shirt for "[a] few minutes" and then reached under the shirt to do the same on her bare skin but did so "more aggressive[ly]." B.M. stated that he rubbed her breast in a "circular motion . . . [l]ike you would rub something sexually." She "just kind of froze" as he did that. When the movie ended, N.B. woke up, and they got up from the bed. N.B. was unaware of what had just transpired.

¶18     A few weeks after this incident, B.M. disclosed Garcia's sexual abuse of both her and N.B. to their mothers, which led to Garcia's arrest. Garcia then pled guilty to three counts of aggravated sexual abuse of a child and was sentenced to three concurrent terms of imprisonment of three years to life.

¶19     The trial court instructed the jury that it could consider the evidence of Garcia's prior convictions, "if at all, for the limited

purpose of determining whether [Garcia] had a propensity to commit the crimes charged in this case" and that it "may not convict [him] in this case simply because he may have been convicted of committing some other acts at another time." The court read this limiting instruction to the jury three times during trial: before each of N.B.'s and B.M.'s testimony and during closing instructions.

¶20 As part of its case-in-chief, the State also called the detective who interviewed Victim at the Children's Justice Center and played a recording of the interview. During the interview, Victim told the detective that Garcia had "raped another little girl," but the detective did not follow up on that comment even though, as he acknowledged at trial, "That's something that would be pretty important to clarify[.]"

¶21 In his defense, Garcia called two experts to testify that although the detective mostly followed appropriate guidelines, his interview of Victim was still "fatally flawed." The expert witnesses testified that the detective should have followed up on Victim's statement that Garcia had raped another little girl and asked questions to assess the influence Mother and *Criminal Minds* may have had on Victim's account. They also asserted that Victim's account was "neither reliable or valid."

¶22 In rebuttal, the State called its own expert witness (Expert), who testified that the detective's interview was proper because "it was conducted following and utilizing [relevant] guideline[s], utilizing best practices in forensic interviewing, and that [Victim] was able to provide narratives of . . . incidents that had occurred based on her recall memory." Expert also opined that Victim's disclosures during the interview "are reliable based on the questions that she was asked." Garcia did not object to this statement but on cross-examination elicited testimony that, unlike one of Garcia's expert witnesses, Expert was not a child psychologist, and that the detective should have followed up on

several issues during the interview, including Mother's statement to Victim that Garcia had raped another girl.

¶23   The jury convicted Garcia on all three counts of aggravated sexual abuse of a child and later found that he had a prior conviction for a grievous sexual offense. Based on this finding, Utah Code section 76-5-404.1(5)(c) required the trial court to sentence Garcia to life in prison without the possibility of parole (LWOP). Garcia filed a motion challenging the statute as unconstitutional under the Eighth Amendment to the United States Constitution and under Article I, Section 9 of the Utah Constitution. The court denied Garcia's motion, holding that "[r]ather than shocking the moral sense as to what is right and proper under the circumstances, [Garcia's] situation shows the appropriateness of the LWOP sentencing enhancement," and sentenced him to LWOP.

¶24   Garcia appeals.

ISSUES AND STANDARDS OF REVIEW

¶25   Garcia raises three issues. First, he argues that the trial court erred in admitting evidence of his prior convictions under rule 404(c) of the Utah Rules of Evidence because it was substantially more prejudicial than probative. *See* Utah R. Evid. 403. We review a trial court's evidentiary rulings for an abuse of discretion. *State v. Ring*, 2018 UT 19, ¶ 17, 424 P.3d 845. *See State v. Beverly*, 2018 UT 60, ¶ 56, 435 P.3d 160 ("Trial courts have wide discretion in determining relevance, probative value, and prejudice.") (quotation simplified). "A district court's decision to admit or exclude evidence is only an abuse of discretion if it is beyond the limits of reasonability." *Ring*, 2018 UT 19, ¶ 17 (quotation simplified).

¶26   Second, Garcia argues that the trial court erred in allowing N.B. and Expert to opine on Victim's credibility. Because this issue

is not preserved, Garcia asks us to review it for plain error. "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Johnson*, 2017 UT 76, ¶ 20, 416 P.3d 443 (quotation simplified). "If any one of these requirements is not met, plain error is not established." *Id.* (quotation simplified).

¶27    Third, Garcia argues that the LWOP mandate in Utah Code section 76-5-404.1(5)(c) is unconstitutional. "Whether a statute is constitutional presents a question of law that we review for correctness." *South Salt Lake City v. Maese*, 2019 UT 58, ¶ 10, 450 P.3d 1092 (quotation simplified). The party challenging a statute "as unconstitutional bear[s] the burden of demonstrating its unconstitutionality." *State v. Jones*, 2018 UT App 110, ¶ 9, 427 P.3d 538 (quotation simplified). Furthermore, because "sentencing statutes derive from a variety of often imprecise policy considerations, . . . we must accord substantial deference to the prerogatives of legislative power in determining the types and limits of punishments for crimes." *State v. Houston*, 2015 UT 40, ¶ 54, 353 P.3d 55 (quotation simplified). Accordingly, "absent a showing that a particular punishment is cruelly inhumane or disproportionate, we are not apt to substitute our judgment for that of the legislature regarding the wisdom of a particular punishment or of an entire sentencing scheme."[3] *Id.* (quotation simplified).

---

3. Garcia also raises a claim of cumulative error. But "because we conclude that there are no errors to accumulate here, the cumulative error doctrine is inapplicable in this case." *State v. Modes*, 2020 UT App 136, ¶ 12 n.5, 475 P.3d 153 (quotation simplified).

ANALYSIS

I. Rule 404(c) Evidence

¶28    Generally, evidence of prior bad acts "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). Such evidence may, however, "be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," *id.* R. 404(b)(2), subject to limits under rules 402 and 403 of the Utah Rules of Evidence, *see State v. Thornton*, 2017 UT 9, ¶ 36, 391 P.3d 1016. *See also* Utah R. Evid. 402 ("Irrelevant evidence is not admissible."); *id.* R. 403 (stating that evidence may be excluded "if its probative value is substantially outweighed by a danger of," among other things, "unfair prejudice").

¶29    But rule 404(c) of the Utah Rules of Evidence exempts evidence of prior acts of child molestation from this "exercise of articulating a non-propensity purpose," instead allowing such evidence "even if there is no other plausible or avowed purpose for such evidence." *State v. Fredrick*, 2019 UT App 152, ¶ 42, 450 P.3d 1154. The rule states, "In a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other acts of child molestation to prove a propensity to commit the crime charged." Utah R. Evid. 404(c)(1). Because rule 404(c) "addresses evidence that the defendant *committed* previous acts of child molestation," "the ultimate legal disposition of a previous act of child molestation is largely irrelevant to whether the evidence is admissible." *State v. Modes*, 2020 UT App 136, ¶ 17, 475 P.3d 153 (emphasis in original). Additionally, "to meaningfully assess the appropriate weight to afford such evidence, the fact-finder will need to hear and consider at least some of the details of the previous acts." *Id.* ¶ 18.

¶30    Evidence of prior acts of child molestation admitted under rule 404(c) is still subject to rule 403's balancing test. *See State v.*

*Ring*, 2018 UT 19, ¶ 28, 424 P.3d 845. Under rule 403, a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Utah R. Evid. 403. In conducting the balancing test, a court "has the discretion to consider any relevant factors," *Ring*, 2018 UT 19, ¶ 29 (quotation simplified), including but not limited to the *Shickles* factors,[4] *see State v. Cuttler*, 2015 UT 95, ¶¶ 18–19, 367 P.3d 981; *id.* ¶ 18 ("Courts are bound by the text of rule 403, and it is unnecessary for courts to evaluate each and every *Shickles* factor in every context.") (quotation simplified); *State v. Lintzen*, 2015 UT App 68, ¶ 15, 347 P.3d 433 ("Each [*Shickles*] factor need not be considered in every case, but a district court evaluating 404(b) and 404(c) evidence should consider those factors it finds helpful in assessing the probative value of the evidence.") (quotation simplified).

¶31    But unlike evidence admitted under rule 404(b), because the defendant's propensity to molest children "is the reason for

---

4. The *Shickles* factors are:

> the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

*State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988) (quotation simplified), *abrogated on other grounds by State v. Doporto*, 935 P.2d 484 (Utah 1997). However, our Supreme Court has held that "it is inappropriate for a district court to ever consider" the final factor, i.e., "whether evidence will lead a jury to overmastering hostility." *State v. Cuttler*, 2015 UT 95, ¶ 20, 367 P.3d 981 (quotation simplified).

admission" under rule 404(c), propensity does not constitute unfair prejudice. *Lintzen*, 2015 UT App 68, ¶ 17 (quotation simplified). *See Fredrick*, 2019 UT App 152, ¶ 46 ("[I]n order for rule 404(c) evidence to be unfairly prejudicial, the defendant must be able to show something *other than* the propensity nature of the evidence that weighs on the prejudice side of the equation.") (emphasis in original). Additionally, because "similarities suggest that [the defendant] had the propensity to commit the alleged crime," the probative value of rule 404(c) evidence for purposes of the rule 403 balancing test increases with the degree of similarity between the prior acts and the acts for which a defendant stands accused. *Ring*, 2018 UT 19, ¶ 30. *See Modes*, 2020 UT App 136, ¶ 18. Nevertheless, the admission of "inflammatory details beyond what is necessary or appropriate for [the fact-finder] to consider" propensity may be unduly prejudicial. *Cuttler*, 2015 UT 95, ¶ 27. *See Fredrick*, 2019 UT App 152, ¶ 46.

¶32 Garcia contends that the trial court exceeded its discretion when, pursuant to rule 404(c), it admitted evidence of his prior aggravated sexual abuse convictions because the probative value of such evidence was substantially outweighed by its risk of unfair prejudice under rule 403. First, he argues that because Victim's testimony about his uncharged sexual acts against her already "provided propensity evidence," the testimony of N.B. and B.M. was substantially less probative than unfairly prejudicial.[5] Specifically, Garcia asserts that because Victim testified that he touched her genitals, breasts, and buttocks on more than three occasions but the State charged him with only

_____

5. The State asserts that this argument is unpreserved. Because we resolve the merits of the claim in the State's favor, we need not address its preservation argument. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("If the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation.") (quotation simplified).

three counts of aggravated sexual abuse of a child, "the State had little need for other 404(c) evidence, having cooperative fact witnesses, expert witnesses, and officers." In sum, Garcia argues that in light of Victim's testimony, N.B.'s and B.M.'s testimony was "unnecessary, needlessly cumulative, and less probative than prejudicial." We disagree. Even accepting Garcia's premise that Victim's testimony that Garcia molested her on more than three occasions constitutes propensity evidence of child molestation, the court's admission of evidence of other prior acts of aggravated sexual abuse of a child was not needlessly cumulative, unnecessary, or less probative than Victim's testimony of other uncharged acts.

¶33 Evidence of Garcia's prior acts of sexual abuse against N.B. and B.M. were arguably more probative of Garcia's propensity to molest children than was Victim's testimony of other uncharged acts Garcia committed against her. At trial, Garcia challenged Victim's credibility on several grounds. For example, he called two expert witnesses who testified that Mother likely tainted Victim's account and that Victim's testimony was "neither reliable or valid." Thus, because Victim's credibility was at issue, other evidence of Garcia's propensity to molest children was independently probative and was also relevant to corroborate Victim's account.

¶34 Additionally, although "the ultimate legal disposition of a previous act of child molestation is largely irrelevant to whether the evidence is admissible under rule 404(c)," *Modes*, 2020 UT App 136, ¶ 17, acts that resulted in conviction certainly carry more probative weight than allegations that did not lead to prosecution or that led to a prosecution that resulted in acquittal. Here, Garcia previously pled guilty to acts of sexual abuse against N.B. and B.M. This stands in sharp contrast to Victim's testimony of Garcia's additional acts of sexual abuse against her, which largely hinged on the jury's evaluation of her credibility. Accordingly, evidence of Garcia's convictions was more probative of his propensity to commit such acts than Victim's testimony about

uncharged acts. For these reasons, it was not an abuse of discretion for the court to admit N.B.'s and B.M.'s testimony in addition to Victim's testimony, and the evidence was not needlessly cumulative.

¶35   Second, Garcia argues that the probative value of his prior acts of sexual abuse toward N.B. and B.M. was substantially outweighed by the risk of unfair prejudice because those acts were dissimilar and more egregious than what Victim alleged. The differences to which Garcia points are that Garcia abused Victim when no one else was at home but abused N.B. and B.M. when others were present in the home; Garcia was not dating a close family member of B.M.; and Garcia touched B.M. only once. Concerning egregiousness, and quoting *Fredrick*, 2019 UT App 152, Garcia argues that N.B.'s testimony that he "made her participate in oral sex while her sister slept in the same bed, rubbed her vagina with his toe, and used a latex glove as a condom, 'contain[ed] technicolor details, beyond its tendency to show a propensity for child molestation.'"[6] *See id.* ¶ 46.

¶36   As discussed above, the probative value of 404(c) evidence increases with the degree of similarity between the prior and alleged acts. *Ring*, 2018 UT 19, ¶ 30. The differences to which Garcia points are relatively minor, and there are significant macro-level similarities among the acts Garcia committed against Victim and those he committed against N.B. and B.M. that

---

6. Garcia also asserts that B.M.'s testimony that he rubbed her breast "aggressive[ly]" was more egregious than what Victim alleged. We disagree with this characterization. Victim testified that Garcia frequently touched her breasts and buttocks both over and under her clothing. She also alleged even more egregious acts such as Garcia rubbing the inside and outside of her vagina, touching her vagina with his penis, and trying to insert his penis into her mouth.

increase the probative value of the evidence concerning N.B. and B.M.

¶37    Garcia dated a close relative of both Victim and N.B., and he frequently ordered each young girl into their relative's bedroom where he sexually abused them. Beginning when Victim and N.B. were both nine years old, Garcia touched their breasts, buttocks, and genitals both over and under their clothes and digitally penetrated their vaginas.[7] And although Garcia did not insert his penis into Victim's mouth and vagina like he did to N.B., his penis still touched Victim's vagina and, on two occasions, he unsuccessfully attempted to insert his penis into Victim's mouth. Thus, both sets of acts were of a relatively similar nature, i.e., they involved contact of Garcia's penis to both Victim's and N.B.'s mouths and vaginas. Finally, the fact that N.B.'s sister was asleep, in the shower, or otherwise preoccupied—and not away at work as was the case with Mother—when Garcia chose to engage in sexual abuse is an insignificant dissimilarity. In more general terms, Garcia abused N.B. and Victim, both nine-year-old girls at the time, when the opportunity presented itself.[8]

¶38    And regarding Garcia's abuse of B.M., the rubbing of her breast both over and under her clothing was similar to how his abuse of Victim and N.B. began. The fact that he abused B.M. only once is immaterial given that he did not have the same access to B.M. that he did to Victim and to N.B. due to B.M. reporting the abuse shortly after it occurred, thereby depriving him of the

---

7. Although Garcia touched N.B.'s vagina with his toe on one occasion, this still falls within the larger picture of his tendency to touch Victim's and N.B.'s vaginas.

8. The same is true for the incident in which Garcia discreetly touched N.B.'s vagina with his toe while others were in the room. Although this act was in a less private setting, he was careful to avoid getting caught and effected this rather brazen touch only when the attention of others was not focused on the two of them.

further opportunity to abuse her. The fact that Garcia did not date a close relative of B.M. is likewise an immaterial difference. B.M. was a close friend of N.B.'s who frequently slept over at N.B.'s house. Therefore, although he had less access to B.M. than he did to N.B., B.M. was still a child with whom Garcia found an opportunity to be in a bedroom and to sexually abuse.

¶39   Thus, Garcia's abuse of Victim, N.B., and B.M. was substantially similar on a macro level. Although there were differences among the three girls' accounts, these differences were comparatively minor and were not so drastic as to significantly detract from the probative value of the 404(c) evidence for purposes of the 403 balancing test.

¶40   The remaining aspect of N.B.'s testimony of which Garcia complains is that he used a latex glove as an improvised condom when he raped her for the first time. This arguably carried the highest risk of unfair prejudice compared to the rest of N.B.'s and B.M.'s testimony. However, although Garcia lodged a general objection to the admission of the 404(c) evidence, following the court's ruling that it was admissible, he did not ask the court to limit N.B.'s testimony to exclude this specific fact on the ground that it was excessively inflammatory. Accordingly, we balance the risk of unfair prejudice this fact posed against the probative value of N.B.'s testimony as a whole. And when considering the highly probative value of N.B.'s testimony, *see supra* ¶¶ 33–39, we cannot say that it was substantially outweighed by the risk of unfair prejudice, especially given the facts of this case. Throughout the course of the trial, the jury heard a lot of distressing—but properly admitted—evidence concerning multiple instances of aggravated sexual abuse of a child. In the context of hearing evidence of Garcia's sexual abuse of three young girls, Garcia's unorthodox use of a latex glove as a condom does not stand out as uniquely inflammatory.

¶41   Additionally, the risk of unfair prejudice was somewhat mitigated by the court's limiting instruction to the jury that it

"may not convict [Garcia] in this case simply because he may have been convicted of committing some other acts at another time." *See State v. Balfour*, 2018 UT App 79, ¶ 34, 418 P.3d 79 ("Utah courts have recognized that limiting instructions . . . reduce somewhat the danger of improper prejudice.") (quotation simplified); *State v. Toki*, 2011 UT App 293, ¶ 34, 263 P.3d 481 ("In the absence of the appearance of something persuasive to the contrary, we assume that the jurors were conscientious in performing their duty, and that they followed the instructions of the court.") (quotation simplified).[9] Accordingly, the risk of unfair prejudice was not so great as to substantially outweigh the probative value of N.B.'s testimony.

¶42 Lastly, Garcia argues that the probative value of the 404(c) evidence is limited because fifteen years had passed since his abuse of N.B. and B.M., and he was therefore "less likely to reoffend." "[T]he passing of time, on its own, is not enough to rob 404(c) evidence of its probative value." *State v. Ring*, 2018 UT 19, ¶ 30, 424 P.3d 845. In this case, the effects of the passage of time on the probative value of the 404(c) evidence are lessened even more so because Garcia spent a majority of the fifteen years in

---

9. Quoting *State v. Wetzel*, 868 P.2d 64 (Utah 1993), Garcia asserts that "curative instructions are not always sufficient to avoid the potential prejudice to the defendant." *Id.* at 69. But "we normally presume that a jury will follow an instruction . . . unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *State v. Harmon*, 956 P.2d 262, 273 (Utah 1998) (quotation simplified). As discussed above, because the admission of the testimony regarding the latex glove was not so unfairly prejudicial as to substantially outweigh the probative value of the 404(c) evidence, it follows that the admission of this testimony did not create such an overwhelming possibility that the jury would disregard the limiting instruction.

prison and was living in a halfway house when he met Mother. Garcia therefore did not have the opportunity to reoffend during most of those fifteen years. *Cf. State v. Cuttler*, 2015 UT 95, ¶¶ 28-29, 367 P.3d 981 (stating that the twenty-seven-year time gap between offenses was less material because "the opportunity to sexually batter young children in the familial setting often occurs only generationally and when the opportunity arises") (quotation simplified).

¶43　Having taken all of Garcia's arguments into consideration, we are not convinced that the court exceeded its "wide discretion in determining relevance, probative value, and prejudice," *see State v. Beverly*, 2018 UT 60, ¶ 56, 435 P.3d 160 (quotation simplified), when it determined that the probative value of the 404(c) evidence was not substantially outweighed by the risk of unfair prejudice.

## II. Improper Bolstering

¶44　Garcia claims that the trial court plainly erred when it permitted two instances of improper bolstering by the State's witnesses: first, when N.B. called Victim "strong" for testifying, and second, when Expert opined that Victim's "disclosures [during the interview] are reliable based on the questions that she was asked." We hold that neither admission amounted to plain error.

¶45　"It is the exclusive province of the jury to determine the credibility of witnesses." *State v. Lewis*, 2020 UT App 132, ¶ 21, 475 P.3d 956. In line with this principle, rule 608(a) of the Utah Rules of Evidence "prohibits any testimony as to a witness's truthfulness on a particular occasion." *State v. King*, 2010 UT App 396, ¶ 44, 248 P.3d 984 (quotation simplified). But the rule does not prohibit a witness "from giving testimony from which a jury could infer the veracity of the witness." *State v. Adams*, 2000 UT 42, ¶ 14, 5 P.3d 642. In other words, testimony that does "not

directly address" the veracity of a witness does not violate rule 608(a). *Id.*

¶46   N.B.'s comment calling Victim "strong" for testifying at trial—the prospect of which had "terrified" N.B. as a child and still caused her anxiety as an adult—did not obviously violate rule 608(a) because it did not "directly address" Victim's veracity at trial.[10] *See id. See also State v. Bair*, 2012 UT App 106, ¶ 47 n.10, 275

---

10. Quoting *State v. Rammel*, 721 P.2d 498 (Utah 1986), Garcia contends that N.B.'s unsolicited statement amounted to improper bolstering because her "opinion 'invited the jury to draw inferences about [Victim's] character based upon [N.B.'s] past experience with' Garcia." *See id.* at 500. Specifically, he asserts that "[t]o call [Victim] 'strong' for testifying, [N.B.] assumed—and conveyed to the jury—that [Victim's] testimony was truthful" based on her own "personal experience with Garcia."

In *Rammel*, the State called a detective to testify as an expert on a witness's "capacity for telling the truth." *Id.* The witness in question testified, under a grant of immunity, that he had planned a robbery with the defendant and driven him away from the scene of the crime in a getaway car. *See id.* at 499. But during his first police interrogation, he denied any involvement in the crime. *See id.* The detective testified at trial that it was not "unusual" for suspects who had been granted immunity to lie during their first police interrogation. *See id.* at 500. As relevant here, our Supreme Court held that the testimony was impermissible because evidence relating to a witness's truthfulness "must go to *that* individual's character for veracity" and because it "invited the jury to draw inferences about [the witness's] character based upon [the detective's] past experience with other suspects." *Id.* (emphasis in original).

*Rammel* is distinguishable from the case before us for two reasons. First, the detective's testimony went directly to the witness's veracity—indeed, he was called for the purpose of

(continued…)

P.3d 1050 (stating that a detective's testimony was not improper because he "did not directly comment on [two witnesses'] veracity, or . . . otherwise directly opine on either person's veracity"). Accordingly, the trial court did not commit error, plain or otherwise, when it permitted this testimony to stand at trial.

¶47   Whether Garcia's second claim of improper bolstering violated rule 608(a), however, is less straightforward. But even assuming, without deciding, that Expert's statement violated the rule, we conclude that the court did not plainly err in admitting the statement because the error was not obvious. Under the plain error standard of review, an error is obvious if "the law governing the error was clear or plainly settled at the time the alleged error was made." *State v. Johnson*, 2017 UT 76, ¶ 21, 416 P.3d 443 (quotation simplified).

¶48   In several cases, this court has held that violations of rule 608(a) amount to obvious error. For example, in *State v. Cegers*, 2019 UT App 54, 440 P.3d 924, we held that the trial court plainly erred when it permitted a victim's school counselor to testify that she did not believe the victim fabricated allegations of sexual abuse in a scholarship application. *Id.* ¶ 30. Similarly, in *State v. Hoyt*, 806 P.2d 204 (Utah Ct. App. 1991), this court held that "it was clearly impermissible under [rule] 608(a)" for the trial court to admit an expert's testimony that a victim was "truthful in her allegations" of sexual abuse. *Id.* at 210–11. And in both *State v.*

---

rehabilitating the witness's character for truthfulness. *Id.* But as discussed above, N.B.'s statement calling Victim "strong" did not go directly to Victim's veracity. And second, our Supreme Court took issue with the testimony inviting the jury to base its evaluation of the witness's truthfulness on the actions of other suspects in similar situations. *Id.* Here, Garcia contends that N.B. was suggesting to the jury that Victim was truthful because Garcia had previously sexually abused N.B. This implicates rules 404(c) and 403—not rule 608(a)—of the Utah Rules of Evidence and, as discussed in section I, those rules were not violated in this case.

*Bragg*, 2013 UT App 282, 317 P.3d 452, and *State v. Adams*, 955 P.2d 781 (Utah Ct. App. 1998), *aff'd*, 2000 UT 42, 5 P.3d 642, we held that it was obvious error for the trial court to allow a detective to testify that the victim's account was consistent and did not appear to be coached. *See Bragg*, 2013 UT App 282, ¶ 31; *Adams*, 955 P.2d at 786.

¶49 But Expert's statement that Victim's "disclosures [during the interview] are reliable based on the questions that she was asked," especially considering the context in which the statement was made, is not obviously in line with these cases. Garcia called two expert witnesses at trial who opined that the detective's interview with Victim at the Children's Justice Center was unreliable because it was "fatally flawed." The State then called Expert to rebut the testimony of those expert witnesses. Expert's testimony focused on the detective's methodology and on Expert's conclusion that the interview was properly conducted. In that context, Expert opined, with our emphasis, that Victim's account during that interview was "reliable *based on the questions that she was asked*." Expert was thus not obviously opining directly on Victim's veracity during the interview or on whether she had been coached. Rather, considering Expert's focus on methodology, the trial court could have interpreted Expert's statement to mean that the specific questions the detective asked Victim during the interview did not affect the reliability of or otherwise taint her answers—and not that Victim's responses were inherently believable.[11] Because Expert's testimony did not

---

11. It is worth noting that Expert's alleged impermissible bolstering of Victim's testimony was counterbalanced by Garcia's own two expert witnesses, who testified that Mother likely influenced Victim's account, that the detective's interview was "fatally flawed," and that Victim's account was "neither reliable or valid." Additionally, on cross-examination, Expert acknowledged that, unlike one of Garcia's expert witnesses, he

(continued…)

obviously amount to impermissible bolstering, its admission was not plain error.

## III. Utah Code Section 76-5-404.1(5)(c)

¶50　Our Legislature "has the power to define crimes and to prescribe punishments, within certain constitutional limits," including the Eighth Amendment to the United States Constitution and Article I, Section 9 of the Utah Constitution. *State v. Bishop*, 717 P.2d 261, 263 (Utah 1986). Garcia argues that Utah Code section 76-5-404.1(5)(c)'s mandate that he be sentenced to LWOP based on his prior conviction of a grievous sexual offense violates both limitations.

¶51　The statute provides,

> Aggravated sexual abuse of a child is a first degree felony punishable by a term of imprisonment of . . . life without parole, if the trier of fact finds that at the time of the commission of the aggravated sexual abuse of a child, the defendant was previously convicted of a grievous sexual offense.

Utah Code Ann. § 76-5-404.1(5)(c) (LexisNexis Supp. 2021).[12] A "grievous sexual offense" includes, among other things, convictions for rape, rape of a child, object rape, object rape of a child, forcible sodomy, sodomy on a child, aggravated sexual

---

was not a child psychologist. He also conceded that the detective should have followed up on several issues, including Mother's influence on Victim.

12. Because the applicable provisions of the Utah Code in effect at the relevant time do not materially differ from those in the most recent printed version of the code, we cite that version for convenience, notwithstanding recent amendments that have no bearing on this appeal.

abuse of a child, and aggravated sexual assault. *Id.* § 76-1-601(8). We hold that Utah Code section 76-5-404.1(5)(c) violates neither constitutional limitation on sentencing.

## A.     Eighth Amendment

¶52     The Eighth Amendment to the United States Constitution provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."[13] U.S. Const. amend. VIII. In other words, it "guarantees individuals the right not to be subjected to excessive sanctions," which "flows from the basic precept of justice that punishment for crime should be graduated and proportioned to both the offender and the offense." *Miller v. Alabama*, 567 U.S. 460, 469 (2012) (quotation simplified).

¶53     Criminal punishments are cruel and unusual if they "are excessive or contravene evolving standards of decency and human dignity." *State v. Houston*, 2015 UT 40, ¶ 54, 353 P.3d 55 (quotation simplified). *See State v. Herrera*, 1999 UT 64, ¶ 33, 993 P.2d 854 ("A criminal punishment may be cruel and unusual when it is barbaric, excessive, or disproportional to the offense committed.") (quotation simplified). "Only rarely will a statutorily prescribed punishment be so disproportionate to the crime that the sentencing statute is unconstitutional." *State v. Guadarrama*, 2015 UT App 77, ¶ 4, 347 P.3d 857 (quotation simplified). "Indeed, outside the context of capital punishment, successful challenges based on a proportionality argument are exceedingly rare." *Id.* (quotation simplified).

---

13. The "cruel and unusual punishments" clause of the Eighth Amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *See Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947); *State v. Houston*, 2015 UT 40, ¶ 54 n.86, 353 P.3d 55.

¶54   Garcia argues that Utah Code section 76-5-404.1(5)(c)'s mandatory sentence of LWOP violates the Eighth Amendment as applied to him[14] because it "is harsher than sentences imposed in Utah for more serious crimes" such as aggravated murder,[15]

---

14. Garcia also argues that the statute is unconstitutional on its face. But because we conclude that the statute withstands his as-applied challenge, his facial challenge also necessarily fails. *See State v. Herrera*, 1999 UT 64, ¶ 4 n.2, 993 P.2d 854 ("A facial challenge . . . requires the challenger to establish that no set of circumstances exists under which the statute would be valid.") (quotation simplified); *id.* ¶ 50 (holding that a defendant's "facial challenge fails a fortiori" when a court concludes that the challenged statute is constitutional as applied to the defendant).

15. Aggravated murder is a knowing and intentional homicide plus an aggravator. *See* Utah Code Ann. § 76-5-202(1) (LexisNexis 2017). An aggravator can be, among other things, a prior conviction for rape, rape of a child, object rape, object rape of a child, forcible sodomy, sodomy on a child, aggravated sexual abuse of a child, and aggravated sexual assault, *see id.* § 76-5-202(1)(j)(vi)–(xiii), which closely mirrors the crimes constituting a "grievous sexual offense" as used in Utah Code section 76-5-404.1(5)(c), *see id.* § 76-1-601(8) (Supp. 2021). Aggravated murder is punishable by death, LWOP, or 25 years to life. *See id.* §§ 76-5-202(3)(a)–(b); 76-3-206(2)(a) (2017); 76-3-207.7(2)(a). *See also id.* § 76-3-207 (setting forth the sentencing procedure for capital aggravated murder).

Under this sentencing scheme, Garcia notes that "someone convicted of aggravated murder in Utah while having a prior conviction for a 'grievous sexual offense' could receive a sentence of twenty-five years to life," whereas LWOP is mandated for a person convicted of aggravated sexual abuse of a child while having a prior conviction for a "grievous sexual offense." Additionally, a jury (or court, on the defendant's request) must

(continued…)

because "most neighboring states and many other states do not mandate LWOP as a sentence for a second conviction for child sexual assault,"[16] and because the mandatory sentence "is contrary to evolving standards of decency." We disagree that Garcia's statutorily mandated prison sentence of LWOP amounts to cruel and unusual punishment on these grounds.

¶55 Because the "sentencing statutes derive from a variety of often imprecise policy considerations," *Houston*, 2015 UT 40, ¶ 54, and because "legislatures are far better equipped than courts to balance the competing penal and public interests and to draw the essentially arbitrary lines between appropriate sentences for different crimes," *Guadarrama*, 2015 UT App 77, ¶ 7 (quotation simplified), "we must accord substantial deference to the prerogatives of legislative power in determining the types and limits of punishments for crimes," *Houston*, 2015 UT 40, ¶ 54 (quotation simplified). Accordingly, "absent a showing that a particular punishment is cruelly inhumane or disproportionate, we are not apt to substitute our judgment for that of the legislature regarding the wisdom of a particular punishment or of an entire

---

consider aggravating and mitigating factors when sentencing a defendant convicted of capital aggravated murder, *see id.* § 76-3-207, whereas section 76-5-404.1(5)(c) simply mandates LWOP. Based on this, Garcia argues that although aggravated murder is a more serious crime than aggravated sexual abuse of a child, the statutory scheme "implies that [his] guilt could be less heinous if he had murdered" Victim.

16. The states Garcia identifies are Alabama, Alaska, Arizona, California, Colorado, Connecticut, Florida, Hawaii, Idaho, Indiana, Kentucky, Maine, Massachusetts, Mississippi, Nebraska, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Dakota, Texas, Vermont, and West Virginia.

sentencing scheme." *Id.* (quotation simplified). The statutory scheme at issue in this case does not rise to that level.

¶56    Under Utah law, LWOP "is only permitted for the gravest of offenses." *Id.* ¶ 66. And while "murder is more serious than other crimes," *State v. Bishop*, 717 P.2d 261, 269 (Utah 1986), our Supreme Court has also recognized that "[s]exual abuse of a child is one of the most heinous crimes recognized by our penal code," *In re Z.C.*, 2007 UT 54, ¶ 18, 165 P.3d 1206. *See LeBeau v. State*, 2014 UT 39, ¶ 50, 337 P.3d 254 ("[S]exual crimes, particularly those involving children, represent an especially heinous form of bodily insult."); *Bishop*, 717 P.2d at 269 ("Crimes against children are usually looked upon as more heinous than those committed against adults[.]"); *id.* at 270 (holding that severe punishment for sodomy on a child is "justified by the effects of the crime on the victims, the prevalence of the crime in society, the defenselessness of the victims, and the high degree of recidivism by offenders"). Furthermore, we agree with the State that because "it is not possible to objectively rank-order each crime by seriousness," "[t]he best available source of those aggregate values is . . . the criminal code itself, which is the collective judgment of the people as expressed through their representatives in the Legislature."

¶57    And although Garcia points to several states that do not mandate LWOP under circumstances similar to this case, he likewise acknowledges that 22 other states do mandate LWOP in these circumstances.[17] Indeed, Alabama and Delaware mandate

---

17. In addition to Utah, the 22 states Garcia identifies that mandate LWOP under similar circumstances are Arkansas, Delaware, Georgia, Iowa, Illinois, Kansas, Louisiana, Maryland, Michigan, Minnesota, Missouri, Montana, Nevada, New Hampshire, New Jersey, Oklahoma, Pennsylvania, South Carolina, Tennessee, Washington, Wisconsin, and Wyoming. Additionally, the federal government mandates LWOP for "[a] person who is convicted of a Federal sex offense in which a minor is the victim . . . if the

(continued…)

LWOP for some first-time child sex offenders. *See* Ala. Code § 13A-5-6(d) (mandating LWOP for certain sex offenses where the offender is 21 or older and the victim is six or younger); Del. Code Ann. tit. 11, § 778(6)(a)(2)(A)–(C) (mandating LWOP for a person "in a position of trust, authority or supervision" who commits sexual abuse of a child resulting in certain injuries or who commits the offenses against three separate victims). This also undermines Garcia's contention that mandatory LWOP "is contrary to the evolving standards of decency," and all the more so when that punishment is applied to recidivist child sex offenders.

¶58    In sum, given the seriousness and heinousness of sexual crimes against children, although "[i]t may seem odd" to some that a defendant with a prior conviction of a grievous sexual offense could potentially serve a lesser sentence for aggravated murder than for aggravated sexual abuse of a child,[18] *Guadarrama*, 2015 UT App 77, ¶ 7, this does not amount to a "cruelly inhumane or disproportionate" punishment in violation of the Eighth Amendment, *Houston*, 2015 UT 40, ¶ 54 (quotation simplified). Indeed, several other states impose similar sentences for child sex offenders with prior sex offense convictions. *See* supra note 17. For this reason, "[i]t is not our role to supplant the Legislature's considered judgment," and "we defer to the Legislature's determination regarding the appropriate penalty." *Guadarrama*, 2015 UT App 77, ¶ 7.

---

person has a prior sex conviction in which a minor was the victim[.]" 18 U.S.C. § 3559(e)(1).

18. However, that same defendant also faces the possibility of capital punishment for aggravated murder. *See* Utah Code Ann. § 76-3-206(2)(a) (LexisNexis 2017).

B.     Article I, Section 9

¶59     Article I, Section 9 of the Utah Constitution "closely approximates the language of the Eighth Amendment to the United States Constitution."[19] *Dexter v. Bosko*, 2008 UT 29, ¶ 7, 184 P.3d 592. It states,

> Excessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted. Persons arrested or imprisoned shall not be treated with unnecessary rigor.

Utah Const. art. I, § 9.

¶60     Similar to the Eighth Amendment standard, "a criminal punishment is cruel and unusual" under Article I, Section 9 "if the punishment is so disproportionate to the offense committed that it shocks the moral sense of all reasonable men as to what is right and proper under the circumstances." *State v. Herrera*, 1999 UT 64, ¶ 33, 993 P.2d 854 (quotation simplified). For the same reasons provided in the context of Garcia's Eighth Amendment challenge to Utah Code section 76-5-404.1(5)(c), *see supra* section III(A), we likewise hold that Garcia's statutorily mandated sentence of

---

19. Our Supreme Court has held that "the last sentence"—often referred to as the Unnecessary Rigor Clause—"makes section 9 broader than its federal counterpart." *State v. Lafferty*, 2001 UT 19, ¶ 73, 20 P.3d 342. Because the Unnecessary Rigor Clause "is focused on the circumstances and nature of the process and conditions of confinement, not on the sentence imposed," *State v. Houston*, 2015 UT 40, ¶ 50, 353 P.3d 55 (quotation simplified), it does not apply to Garcia's challenge. Instead, because his challenge "is directed to the sentence imposed," *see Dexter v. Bosko*, 2008 UT 29, ¶ 17, 184 P.3d 592, we base our analysis on the first sentence of Article I, Section 9, which is very similar to the language of the Eighth Amendment.

LWOP does not "shock[] the moral sense of all reasonable" persons, *see Herrera*, 1999 UT 64, ¶ 33, and therefore does not violate Article I, Section 9.

CONCLUSION

¶61 The trial court did not err in admitting evidence of Garcia's prior convictions of aggravated sexual abuse of a child. It likewise did not plainly err when it admitted two instances of alleged impermissible testimony that bolstered Victim's credibility. Finally, Garcia's statutorily mandated sentence of LWOP based on his prior convictions of aggravated sexual abuse of a child does not violate the Eighth Amendment to the United States Constitution or Article I, Section 9, of the Utah Constitution.

¶62 Affirmed.

—————