2024 UT App 11

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JOHN ANTHONY FORBUSH,
Appellant.

Opinion
No. 20180319-CA
Filed January 25, 2024

First District Court, Brigham City Department
The Honorable Kevin K. Allen
The Honorable Spencer D. Walsh
No. 151100325

Staci A. Visser, Attorney for Appellant

Sean D. Reyes and Marian Decker,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGE GREGORY K. ORME and SENIOR JUDGE KATE APPLEBY
concurred.[1]

TENNEY, Judge:

¶1   A jury convicted John Anthony Forbush of two counts of sodomy on a child and one count of dealing in material harmful to a minor. Forbush challenged his convictions on appeal, raising a number of ineffective assistance of counsel claims. Contemporaneous with his appellate brief, Forbush also filed a motion for a rule 23B remand, asking for an evidentiary hearing to develop additional record evidence about several ineffective assistance claims. We granted that request with respect to some

---

1. Senior Judge Kate Appleby sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(7).

(though not all) of those claims. Having considered the relevant law and the record developed in both the original proceedings and the rule 23B remand, we affirm Forbush's convictions.

BACKGROUND[2]

*B.B.'s Allegations*

¶2 During the weekend of June 26 to 27, 2015, five-year-old B.B. slept over at the home of Forbush, who is his uncle. About three weeks later, B.B. was showering with his father (Father), as was apparently their occasional practice, when B.B. asked why his uncircumcised penis looked different from Father's circumcised penis. Father replied that B.B. didn't need to worry because he wouldn't see any other penises like Father's. B.B. initially responded with a "blank stare," but "then he seemed real excited" and let Father know that he had seen Forbush's penis and that it looked like Father's. Continuing, B.B. told Father that Forbush had put his penis in B.B.'s mouth, after which Forbush had "made him" watch "older people," which Father interpreted to mean that Forbush had shown pornography to B.B.

¶3 The next week, B.B. was interviewed at the Children's Justice Center (CJC) by a trained investigator (Investigator 1). In that interview, which was recorded, B.B. said that while he was asleep at Forbush's house, Forbush had woken B.B. up while Forbush was wearing only his socks. B.B. said that Forbush had

---

2. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Suhail*, 2023 UT App 15, n.1, 525 P.3d 550 (quotation simplified), *cert. denied*, 531 P.3d 730 (Utah 2023).

Also, because there are a large number of events and claims involved in this appeal, additional details relevant to many of the claims (particularly those for which we ordered a rule 23B remand) will be provided in the relevant portions of our Analysis.

him watch "gross shows" in which naked men and women performed various sex acts on each other.[3] B.B. said that Forbush then offered to buy B.B. a new toy if he would suck on Forbush's penis. B.B. said that he refused, but that Forbush "wiggle[d]" his own penis and made B.B. suck on it anyway. B.B. said that Forbush then put "his private" in B.B.'s "butthole."

*Charges and Relevant Pretrial Events*

¶4     In October 2015, the State charged Forbush with two counts of sodomy on a child, both first-degree felonies, and one count of dealing in material harmful to a minor, a third-degree felony. The case went to trial in February 2018. In the interim, several events occurred that are relevant to the issues on appeal.

¶5     First, in March 2017, the prosecutor and a victim advocate met with B.B. in a conference room of a public library to "refresh his memory and make sure he was on board." Father was also present at this meeting. The prosecutor and the victim advocate showed B.B. a recording of his CJC interview, which had been taken nearly two years earlier, and the prosecutor asked B.B. to confirm "the pertinent parts." When B.B. got to the portions of the interview in which he had discussed the anal sodomy allegation, B.B. "looked really uncomfortable." B.B. then "turned in and looked at his dad" and said, "Ew, gross. That never happened." In that same interview, however, B.B. still confirmed that Forbush had made him suck on Forbush's penis.

¶6     The next day, the prosecutor informed the judge and Forbush's counsel (Pretrial Counsel) of this partial recantation. (As discussed more fully below, a different attorney (Trial Counsel) replaced Pretrial Counsel shortly before trial.) At the subsequent trial, Trial Counsel did not ask B.B. or any other

---

3. B.B. described the videos and the sex acts that he observed in some detail during this interview, but we need not recount the particulars here.

witness about the partial recantation, nor did he inform the jury of it in any way.

¶7      Second, the State filed a pretrial motion seeking leave to introduce evidence that Forbush had previously molested B.C. and L.T., two other children that he knew. B.C. was the daughter of Forbush's neighbor. The State alleged that on one occasion in May 2014 (when B.C. was about five years old), B.C. was at Forbush's home when he took her to his garage on the pretext of seeing a cat, after which he touched her "privates" over her clothes. L.T. was the daughter of one of Forbush's friends. The State alleged that on one occasion in 2012 (when L.T. was about six years old), Forbush babysat L.T. and her sister at his house. According to the State, Forbush told the sister to leave the room; when she did, he cajoled L.T. into playing a game during which he put a sock over her eyes as a blindfold and then put his testicles in her mouth.

¶8      In its motion, the State sought permission to call both girls as witnesses at trial, as well as to play their CJC interviews in which they had described these events. The State argued that these accounts should be admitted as propensity evidence under rule 404(c) of the Utah Rules of Evidence. As part of its rule 404(c) analysis, the State argued that the evidence was admissible under rule 403. And in the course of this argument, the State told the court that it "must consider" all six of the so-called *Shickles* factors.[4] Pretrial Counsel opposed the State's request to admit these allegations. In his written opposition to the overall motion, Pretrial Counsel didn't object to the State's assertion that the court must consider the *Shickles* factors in its analysis. The district court subsequently issued a written decision admitting the evidence. In this ruling, the court concluded that it "must apply the six *Shickles* factors," and it then addressed each of them in turn.

---

4. As will be discussed below, these factors are derived from *State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988), *abrogated by State v. Doporto*, 935 P.2d 484 (Utah 1997).

¶9      Third, shortly before trial, an attorney entered an appearance on B.B.'s behalf and then filed a motion asking the court to allow B.B. to testify remotely and outside of Forbush's presence. In a hearing on the matter, the court heard testimony from B.B.'s grandmother (Grandmother), who was B.B.'s legal guardian by this time. Grandmother testified about B.B.'s mental health struggles and his tendency to shut down when he became angry or nervous, and she also expressed her opinion that B.B. would be intimidated by the courtroom setting. The prosecutor also informed the court that B.B. had shown reluctance to see Forbush again, as evidenced by a recent incident where B.B. had "close[d] up quite a bit" when that prospect came up. Over Forbush's objection, the court granted the request to allow B.B. to testify remotely and outside Forbush's presence. In this ruling, the court found that B.B. would suffer serious mental or emotional strain and that his testimony would be inherently unreliable if he were required to testify in Forbush's presence.

¶10     Finally, Forbush was represented by Pretrial Counsel for the first two years of the proceedings. In December 2017, the court scheduled a trial date for February 2018. Pretrial Counsel then withdrew, citing a conflict between his schedule and the trial date, after which Trial Counsel appeared on Forbush's behalf. Trial Counsel soon requested a continuance of the trial to give him more time to prepare. But the court denied the request, citing its concern that the trial had already been continued many times, as well as its belief that Trial Counsel would still have adequate time to prepare.

*Trial*

¶11     In February 2018, a three-day trial was held. The State called eight witnesses in its case-in-chief. These included B.B., Father, Investigator 1, and the CJC investigator who interviewed both B.C. and L.T. (Investigator 2).

¶12     B.B., B.C., and L.T. each testified that they had watched their CJC interviews and that they had told the truth in the interviews. In their testimonies, Investigator 1 and Investigator 2

explained that they had received forensic interview training (FIT) on how to interview children about allegations of abuse, and Investigator 2 explained the FIT techniques in some detail. Pursuant to its earlier ruling, the court allowed the State to play recordings of each CJC interview. *See* Utah R. Crim. P. 15.5(a) (allowing admission of an "oral statement" of a minor child in "any case concerning a charge of child abuse or of a sexual offense against a child" if certain conditions are met). And before each CJC interview was played, the investigator who had conducted the interview described the circumstances surrounding it.

¶13    As noted earlier, the court had ruled that B.B. could testify outside the presence of both the jury and Forbush. When it was time for his testimony, B.B., the attorneys, and the judge went into a separate room; the jury remained in the courtroom; and Forbush was moved to a "cry room" at the back of the courtroom. B.B.'s testimony was transmitted to a screen in the courtroom. Forbush did not have his own screen in the cry room, but the room was arranged so that he could see the screen through a window, and court personnel later testified that a speaker was turned on so that Forbush could hear the proceedings.

¶14    Before B.B.'s testimony began, the prosecutor made a record that, pursuant to the governing rule, a telephone connection from Forbush to Trial Counsel had been made available but that Trial Counsel had chosen "a different option." In an on-the-record dialogue between Trial Counsel and the court, the court explained the court and counsel had agreed that Forbush could write down any questions or concerns he had during B.B.'s direct examination and that Forbush would then be given the chance to consult with Trial Counsel during a break between direct and cross-examination. Trial Counsel said on the record that he thought this was the "best way" to handle the testimony, and the court likewise expressed its view that this was "the smartest way to do" things so as to avoid distracting Trial Counsel during B.B.'s direct examination. The court minutes show that

Trial Counsel took a nine-minute recess at some point after B.B.'s direct examination to consult with Forbush.[5]

¶15    After the cross-examination of B.B. concluded, the court solicited questions from the jury. At this point, the court learned that there had been a problem with the audio, that the jury had not heard most of B.B.'s direct testimony, but that the jury had heard the cross-examination. The court met with counsel to discuss the matter and it was agreed that the court would ask B.B. certain "key questions" that the prosecutor "wanted repeated." The court then followed that approach. And among the questions the court asked were whether B.B. had watched his CJC interview and told the truth in it. B.B. responded affirmatively.[6]

¶16    The jury convicted Forbush on all counts.

*Rule 11(g) Supplementation*

¶17    After his conviction, Forbush filed a motion to supplement the record pursuant to then-rule 11(g) of the Utah Rules of Appellate Procedure.[7] Forbush sought leave to supplement the

---

5. While the plan had apparently been for this consultation to take place in between B.B.'s direct and cross examinations, the court's minutes and the transcript from the hearing both indicate that this consultation took place midway through Trial Counsel's cross-examination of B.B. Still, both records indicate that it did occur and that the cross-examination continued for some period afterward.

6. At a subsequent hearing, one witness testified that this was the first time that remote testimony had been taken in this manner in this county, thus providing some context for the failure to ensure that the jury could hear B.B.'s direct examination.

7. The rule has since been amended, and the relevant portions of the rule are now in rule 11(f) of the Utah Rules of Appellate Procedure.

record regarding three sets of events, only two of which are relevant to this appeal: (i) the circumstances surrounding B.B.'s partial recantation and what was communicated about it to Pretrial Counsel and (ii) the circumstances surrounding B.B.'s testimony at trial (including the technical difficulties with the audio). The State stipulated to the supplementation proceeding, and the subsequent hearing was conducted by a different judge than the one who had presided at trial.

¶18 Forbush testified at that hearing, alleging for the first time that he couldn't hear any of B.B.'s trial testimony, direct or cross. Trial Counsel testified as well, and he explained that the cry room had been set up so that Forbush could see the same screen that the jury was using to see B.B.'s testimony. He further testified that a speaker had been turned on in the cry room so that Forbush could hear the testimony. Trial Counsel did not say that Forbush had raised any concerns about being unable to hear the proceedings.

*Rule 23B Remand*

¶19 Forbush appealed, and in his opening brief, he challenged his convictions on multiple grounds. Forbush also filed a motion for a remand under rule 23B of the Utah Rules of Appellate Procedure. There, Forbush alleged that Pretrial Counsel and Trial Counsel had provided ineffective assistance on several fronts relating to the investigation of the case and the testimonies presented (or not presented) at trial. This court granted Forbush's motion in part. Following an evidentiary hearing at which seven witnesses testified, the rule 23B court entered detailed findings of fact addressing the various issues for which we remanded.[8]

---

8. The rule 23B remand was conducted by the same judge who had presided over the rule 11(g) supplementation proceedings.

ISSUES AND STANDARDS OF REVIEW

¶20     Forbush raises multiple claims of error on appeal, many of which have common standards of review. The claims are these:

-   First, Forbush argues that he received ineffective assistance when his attorneys failed to either investigate B.B.'s partial recantation or instead introduce that recantation at trial.

-   Second, Forbush argues that the district court erred by using the *Shickles* factors as part of its assessment of whether to admit the recordings of the CJC interviews of L.T. and B.C. under rule 403(c); in the alternative, Forbush argues that he received ineffective assistance when Pretrial Counsel did not object to the court's use of the *Shickles* factors.

-   Third, Forbush argues that the district court abused its discretion by allowing B.B. to testify outside of Forbush's presence, claiming that there was insufficient evidence to support the required findings.

-   Fourth, Forbush argues that the district court committed plain error when it failed to inform B.B. that Forbush was listening to his testimony. Relatedly, Forbush argues that he received ineffective assistance when Trial Counsel failed to prevent or object to various technological failures and rule violations during B.B.'s remote testimony.

-   Finally, Forbush raises a series of ineffective assistance claims for which this court previously ordered the rule 23B remand, including alleged failures by his attorneys to investigate the case or call certain witnesses.

¶21     For Forbush's preserved claims that are evidentiary in nature, we review the district court's rulings for an abuse of discretion. *See State v. Suhail*, 2023 UT App 15, ¶ 68, 525 P.3d 550,

*cert. denied*, 525 P.3d 730 (Utah 2023). "[L]egal errors, such as the incorrect interpretation of a statute or the application of an improper legal standard, are usually an abuse of discretion." *Schroeder v. Utah Att'y Gen.'s Office*, 2015 UT 77, ¶ 49, 358 P.3d 1075.

¶22    On the unpreserved claim for which Forbush asserts plain error, Forbush must show "that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error [was] harmful." *Suhail*, 2023 UT App 15, ¶ 69 (quotation simplified). The harm analysis in a plain error claim is "equivalent to the prejudice test applied in assessing claims of ineffective assistance of counsel." *State v. Johnson*, 2017 UT 76, ¶ 21, 416 P.3d 443 (quotation simplified).

¶23    For Forbush's ineffective assistance of counsel claims that are raised for the first time on appeal, these claims present questions of law. *See Suhail*, 2023 UT App 15, ¶ 72. And finally, on the ineffective assistance claims for which we ordered a rule 23B remand, we "defer to the trial court's findings of fact," but we "review its legal conclusions for correctness." *State v. Wright*, 2013 UT App 142, ¶ 10, 304 P.3d 887 (quotation simplified).

ANALYSIS

I. Trial Counsel's Failure to Investigate or Use B.B.'s Partial Recantation at Trial

¶24    During a March 2017 meeting with the prosecutor, a victim advocate, and Father, B.B. claimed that the anal sodomy incident didn't happen (though, as noted, B.B. reiterated in that same interview that the oral sodomy incident did happen). The prosecutor informed Pretrial Counsel of B.B.'s partial recantation the next day, and in his brief, Forbush concedes that Trial Counsel was also "aware of" this recantation. Despite being aware of the recantation, Trial Counsel didn't ask any witnesses about it at trial. When asked about this at the rule 11(g) hearing, Trial Counsel testified that the witnesses he was "aware of that would

have been involved in the recantation" were the prosecutor and the victim advocate, thus suggesting that he was unaware that Father was also in the room. Trial Counsel then said that he chose not to ask the victim advocate about the recantation because, based on his experiences with her in other cases, he was worried that she would be a hostile witness. From all this, Forbush argues that Trial Counsel was ineffective on two related grounds: first, for not properly investigating the incident, which in Forbush's view would have caused Trial Counsel to learn that Father was in the room, thereby allowing Trial Counsel to ask Father about the recantation at trial; and second, for not at least questioning the victim advocate about the recantation at trial.

¶25 To prevail on an ineffective assistance claim, Forbush must first "show that counsel's performance was deficient," and second, "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish deficient performance, Forbush must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (quotation simplified). The focus of this inquiry is reasonableness, and we "judge the reasonableness of counsel's challenged conduct, viewed as of the time of counsel's conduct." *State v. Carter*, 2023 UT 18, ¶ 45, 535 P.3d 819 (quotation simplified). To establish prejudice, Forbush "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Bonds*, 2023 UT 1, ¶ 53, 524 P.3d 581 (quotation simplified). When evaluating a prejudice claim in the ineffective assistance context, "we assess counterfactual[] scenarios—that is, what would have happened but for the ineffective assistance," and "we may do so with the evidence available to us, even when not part of the original record." *Ross v. State*, 2019 UT 48, ¶ 76, 448 P.3d 1203.

¶26 Forbush must establish both deficient performance and prejudice. *See State v. Suhail*, 2023 UT App 15, ¶ 122, 525 P.3d 550, *cert. denied*, 525 P.3d 730 (Utah 2023). If either is lacking, "the claim

fails" and this court "need not address the other." *State v. Nelson*, 2015 UT 62, ¶ 12, 355 P.3d 1031. Thus, if "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, we will do so without analyzing whether counsel's performance was professionally unreasonable." *State v. Potter*, 2015 UT App 257, ¶ 7, 361 P.3d 152 (quotation simplified). Here, even if it were true that Trial Counsel performed deficiently by not properly investigating the partial recantation or instead by not asking the victim advocate about it at trial (points that we do not decide), we still reject these claims because Forbush has not established that he was prejudiced by the alleged errors.

¶27    Forbush argues that questioning about the recantation would have mattered because B.B.'s testimony was the only direct evidence that the abuse occurred and because B.B. had now claimed that one of the two sodomy incidents at issue didn't happen. And we agree that in many cases (particularly those in which there is a lack of corroborative evidence), a recantation from the complaining witness may have strong probative value. But even so, a prejudice analysis in an ineffective assistance case remains contextual. And in the context of this case, we don't believe that there is a reasonable probability that the outcome at trial would have been different if the jury had heard about this recantation from either Father or the victim advocate. This is so for several reasons.

¶28    First, as with any other kind of evidence, not every recantation is the same. And the circumstances here suggest that this recantation was of somewhat lesser probative value. It didn't come from an adult; it came from a young child. It wasn't made in writing or under oath; it occurred in conversation during an informal interview. And it didn't contain any detailed explanation for why the declarant had changed his account; rather, after B.B. very briefly recanted, the conversation quickly moved on.

¶29    Second, this recantation wasn't B.B.'s first word on the matter. In separate conversations, he had previously told two people (Father and Investigator 1) that Forbush had anally

sodomized him. And this recantation wasn't his last word on the matter either. At trial, B.B. testified under oath that he had since watched his earlier interview from the CJC, and he further testified that he had told the truth in that interview. Thus, this isn't a case in which a complaining witness recanted and later stood by the recantation. Rather, the complaining witness here withdrew the recantation, in effect recanting the recantation.

¶30    Third, in the counterfactual scenario in which evidence of B.B.'s recantation was presented at trial, the jury essentially would have been presented with the choice of which version of events to believe: the version he briefly advanced at the library; or, instead, the version he told to Father, and then Investigator 1, and then at trial.

¶31    In that counterfactual scenario, the State would have had several available arguments in which it could have assailed the credibility of the recantation. *See Ross*, 2019 UT 48, ¶ 78 (noting that "it is appropriate to consider the impact the State's rebuttal evidence would have had if it had been presented at [the] original trial"). One of them is drawn directly from the library interview itself. When B.B. was asked about the anal sodomy allegation, he "turned in and looked at his dad" before saying, "Ew, gross" and then recanting, thus suggesting that he had become embarrassed by talking about that allegation in front of his father.

¶32    The State also would have been able to point to contextual evidence that the CJC interview was more reliable all along. After all, that interview was conducted in a more comfortable setting and with fewer people around, and the questioner was an investigator who had specific training and experience in how to conduct forensic interviews of children. By contrast, the interview at the library was conducted by a prosecutor in the presence of two other people, and there's no indication that the prosecutor had such training or was following such techniques. In the counterfactual world in which Trial Counsel had elicited testimony about the recantation, the State very likely would have offered testimony and argument on these very points.

¶33    Finally, we note again that the recantation was only partial—although B.B. disclaimed the alleged anal sodomy incident during the library interview, he reaffirmed that the oral sodomy incident had occurred, and he never recanted the pornography allegation. And as we explain below, we see no error in the court's admission of the testimonies from B.C. or L.T., each of whom testified about abuse from Forbush, with that testimony being admitted to show Forbush's propensity toward committing sex offenses against children. And as we also explain below, we see no basis for concluding that there was additional available evidence that should have been presented that could have meaningfully impeached Father's testimony about B.B.'s initial statements to him.

¶34    Putting all this together, here's what we have: this wasn't the strongest of recantations, there was a plausible explanation on its face for concluding that the recantation was itself untrustworthy, B.B. subsequently affirmed under oath that the abuse happened, there was reason to believe that B.B.'s earlier allegations were more reliable, and there was other testimony before the jury that was unaffected by this recantation that supported the State's case. From all this, we see no reasonable probability that the outcome at trial would have been different if the jury had heard about the brief recantation B.B. made during the library interview. We accordingly reject this ineffective assistance claim for lack of prejudice.

## II. Rule 404(c) Evidence

¶35    Forbush next raises issues relating to the admission of the testimonies of L.T. and B.C. under rule 404(c) of the Utah Rules of Evidence.

¶36    First, some background. As a general rule, evidence of a person's "crime, wrong, or other act" is not admissible "to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). "But this limitation does not apply in child molestation cases, where rule 404(c) applies." *State v. Modes*, 2020 UT App 136,

¶ 14, 475 P.3d 153. Rule 404(c) states that in "a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other acts of child molestation to prove a propensity to commit the crime charged." Utah R. Evid. 404(c)(1). "The drafters of our rules of evidence have determined, as a policy matter, that propensity evidence in child molestation cases can come in on its own terms, as propensity evidence, even if there is no other plausible or avowed purpose for such evidence." *Modes*, 2020 UT App 136, ¶ 14 (quotation simplified).

¶37    When the State seeks to introduce such evidence, however, the evidence "is still subject to rule 403's balancing test." *State v. Garcia*, 2022 UT App 77, ¶ 30, 526 P.3d 1238, *cert. denied*, 525 P.3d 1260 (Utah 2022). And under that rule, a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Utah R. Evid. 403. For many years, Utah courts considered the so-called *Shickles* factors when conducting a rule 403 analysis. Those factors are "the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility." *State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988) (quotation simplified), *abrogated by State v. Doporto*, 935 P.2d 484 (Utah 1997).

¶38    In 2014, our supreme court clarified that while "some of these factors may be helpful in assessing the probative value of the evidence in one context, they may not be helpful in another." *State v. Lucero*, 2014 UT 15, ¶ 32, 328 P.3d 841, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. It "is therefore unnecessary for courts to evaluate each and every factor and balance them together in making their assessment." *Id.* A year later, our supreme court considered the issue again, this time holding in a rule 404(c) case that while it "may very well be

appropriate" for a court to consider some of the *Shickles* factors in a rule 403 analysis, "it is not appropriate for a district court to moor its rule 403 analysis entirely and exclusively to all of the *Shickles* factors." *State v. Cuttler*, 2015 UT 95, ¶ 19, 367 P.3d 981. Of note here, the supreme court further held that it is inappropriate for a court to consider the sixth *Shickles* factor (the degree to which the evidence probably will rouse the jury to overmastering hostility) in a rule 403 analysis because that standard presents "both a stricter and looser metric" than the one at issue in rule 403 (which most commonly looks to whether the evidence's probative value is substantially outweighed by the danger of unfair prejudice). *Id.* ¶ 20.

¶39 As noted, the district court permitted the State to introduce evidence that Forbush had previously abused both L.T. and B.C. In doing so, and in apparent response to the State's express invitation, the court applied all six *Shickles* factors in the rule 403 portion of its analysis. Because of this, Forbush now argues that Pretrial Counsel (who was the attorney who responded to the State's motion) rendered ineffective assistance on two related grounds: first, for apparently not knowing that the court should not use all six *Shickles* factors; and second, for not objecting to their improper use.[9]

¶40 We have no difficulty rejecting the first aspect of Forbush's claim. A "lawyer's lack of knowledge is not alone enough to amount to deficient performance." *State v. Sessions*, 2014 UT 44,

---

9. Forbush separately argued in his opening brief that the district court abused its discretion by misapplying the *Shickles* factors. But as the State pointed out in response (and as Forbush then conceded in his reply), Forbush never made this argument below. "When a party fails to raise and argue an issue in the trial court, it has failed to preserve the issue, and an appellate court will not typically reach that issue absent a valid exception to preservation." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443. We accordingly address this issue only through the lens of ineffective assistance of counsel.

¶ 22, 342 P.3d 738. Instead, "the operative inquiry is whether the actual representation would still have been within the range of objectively reasonable representation, even if counsel had been aware of the law." *Id.* (quotation simplified).

¶41    This leaves Forbush's second argument (which is the real thrust of this claim). And again, the argument here is that Pretrial Counsel was ineffective for not objecting to the proposed use of the *Shickles* factors in the rule 403 portion of the analysis. We have some doubt whether this was indeed deficient performance. After all, even if Pretrial Counsel was aware of the cases holding that it's inappropriate to "moor" a rule 403 analysis "entirely" on the *Shickles* factors, counsel may have thought that adding those factors into the mix would actually make it harder for the State to admit the proposed evidence, thereby helping Forbush's case. *Cf. Cuttler*, 2015 UT 95, ¶ 21 (noting that the district court there had required the State to "overcome the hurdles presented by [r]ule 403 *and* the *Shickles* factors," thus arguably imposing a higher burden on the State than was presented by rule 403 itself (emphasis in original, quotation otherwise simplified)).

¶42    Regardless, we need not decide this issue on this basis because we see no reasonable likelihood that the evidence would have been excluded if the court had not used the *Shickles* factors in its analysis. Under *Cuttler*, courts are still permitted to use most of these factors in a rule 403 analysis. The key differences are that (i) a court can no longer "moor its rule 403 analysis entirely and exclusively to all of the *Shickles* factors," and (ii) a court cannot use the "overmastering hostility" factor as part of the "unfair prejudice" analysis. *Cuttler*, 2015 UT 95, ¶¶ 19–20.

¶43    Here, the district court concededly committed both errors. But at oral argument before our court, Forbush's appellate counsel agreed that an analysis that had been conducted purely under rule 403 would not have been "more restrictive" than an analysis that used the six *Shickles* factors. This concession may have been overly generous—again, *Cuttler* suggested that the overmastering hostility factor "is both a stricter and looser metric" than rule 403's unfair prejudice standard. *Id.* ¶ 20.

¶44 Regardless, Forbush hasn't convinced us that there's a reasonable likelihood that removing this particular factor (or any other *Shickles* factor, for that matter) would have changed things such that the court would have now excluded this evidence. After all, it's settled that under rule 403, courts should "indulge a presumption in favor of admissibility." *State v. Green*, 2023 UT 10, ¶ 78, 532 P.3d 930 (quotation simplified). And one of the *Shickles* factors that remains viable in the rule 403 analysis is the similarity between the crimes. *See Cuttler*, 2015 UT 95, ¶ 19. In its ruling admitting this evidence, the district court found that the cases "contain[ed] very similar facts," and we agree that a number of commonalities were present. The alleged victims were of roughly similar ages; each alleged incident occurred in Forbush's home; each of the alleged victims was familiar to Forbush or linked to him in some way; each alleged instance appeared to be a crime of opportunity rather than the product of long-term grooming; and each alleged instance involved Forbush touching the child inappropriately and then urging the child to touch him inappropriately.

¶45 In response, Forbush points to some dissimilarities between B.B.'s account and those given by B.C. and L.T., including the different genders and variations in the body parts that Forbush touched or caused to be touched. This claim, however, is about counsel's failure to object to the court's mechanistic use of the *Shickles* factors. But a proper rule 403 analysis doesn't require that the past incidents be identical; rather, what's at issue is the "degree of similarity." *Garcia*, 2022 UT App 77, ¶¶ 31, 36. Here, even with these differences, there were many similarities. For this reason, the incidents were probative of Forbush's propensity to commit the kind of crime at issue. And their admission also would not constitute unfair prejudice as that term is used in this context. We've recognized that the "prejudice analysis under rule 403—when associated with rule 404(c)—focuses on prejudice other than the fact that the evidence shows propensity to engage in reprehensible behavior involving children." *Modes*, 2020 UT App 136, ¶ 21 (quotation simplified). Indeed, "after rule 404(c), the accused's propensity is the reason

for admission and no longer constitutes unfair prejudice." *State v. Lintzen*, 2015 UT App 68, ¶ 17, 347 P.3d 433 (quotation simplified).

¶46 In addition, the court's initial ruling contains ample other indicators that it would have admitted this testimony even in a properly focused analysis. For example, the court found that "the strength of the evidence as to the commission" of the abuse against the two girls was "strong" and that the interval of time between the incidents was brief enough that they each retained probative value. The court also found that the presentation of this evidence would assist jurors in assessing the credibility of B.B.'s account, which it regarded as weighing in favor of admissibility because of the court's assessment of the "efficacy of alternative proof for the charges in this case." In *Cuttler*, the supreme court specifically approved continuing use of that very factor in a rule 403 analysis such as this one. 2015 UT 95, ¶ 19.

¶47 Because this issue is presented through the lens of an ineffective assistance claim, Forbush bears the burden of persuading this court that there's a reasonable likelihood of a different outcome if this objection had been made. On this record, we see no reasonable probability that the district court would have excluded these testimonies if it had not been asked to use all six *Shickles* factors (or, instead, if it had realized that it should not consider the sixth factor). As a result, we see no basis for concluding that Forbush was prejudiced by any deficient performance, so we reject this claim.[10]

---

10. Forbush also argues that L.T. and B.C.'s stories had reliability problems. When he raised this argument below, however, the trial court found that it lacked evidentiary support. On appeal, Forbush requested leave to develop further evidence of these alleged problems as part of his request for a rule 23B remand. But we concluded that his proffered allegations were insufficient to warrant such a remand, so we rejected that request.

### III. Decision to Allow B.B. to Testify Remotely

¶48    Rule 15.5(b) of the Utah Rules of Criminal Procedure applies in "a criminal case concerning a charge of child abuse or of a sexual offense against a child." In such a case, and "upon motion of a party and for good cause shown," the court "may order that the testimony of any victim or other witness younger than 14 years of age be taken in a room other than the court room, and be televised by closed circuit equipment to be viewed by the jury in the court room." *Id.* The rule further states that "[o]nly the judge, attorneys for each party and the testifying child (if any), persons necessary to operate equipment, and a counselor or therapist whose presence contributes to the welfare and emotional well-being of the child may be in the room during the child's testimony." *Id.* R. 15.5(b)(1). With respect to the defendant's presence, the rule states:

> A defendant who consents to be hidden from the child's view may also be present unless the court determines that the child will suffer serious emotional or mental strain if required to testify in the defendant's presence, or that the child's testimony will be inherently unreliable if required to testify in the defendant's presence.

*Id.*[11] Acting pursuant to a motion and evidence taken at a hearing, the district court permitted B.B. to testify remotely, and it further

---

11. If a court makes the requisite determination under rule 15.5, its decision to allow the child to testify remotely does not violate the Sixth Amendment's Confrontation Clause. Thus, so "long as a trial court makes such a case-specific finding of necessity, the Confrontation Clause does not prohibit a State from using a one-way closed circuit television procedure for the receipt of testimony by a child witness in a child abuse case." *Maryland v. Craig*, 497 U.S. 836, 860 (1990).

ordered that Forbush would observe that testimony from an adjacent room.

¶49  Forbush now argues that the district court committed two errors in this decision: first, Forbush claims that the court was required to take expert testimony to support any determination that B.B. should be allowed to testify remotely; and second, Forbush claims that there was insufficient evidence to support either of the requisite findings. We disagree on both fronts.[12]

¶50  First, we disagree with Forbush's contention that the court was required to take expert testimony. In support of this claim, Forbush points to several cases in which courts ruled that a child could testify remotely based, in part, on an expert's evaluation of the child. *See, e.g., State v. Widdison*, 2001 UT 60, ¶ 59, 28 P.3d 1278; *Glendening v. State*, 536 So. 2d 212, 218 (Fla. 1988); *State v. Baeza*, 383 P.3d 1208, 1209 (Idaho 2016). And we agree with Forbush that an expert's evaluation might prove helpful to a court that is tasked with making this determination. But *helpful* is not the same thing as *required*. The rule itself doesn't require expert testimony, and we've been pointed to no authority (controlling or otherwise) in which any court has held that expert testimony must be offered before a court can make such a determination.

---

12. In its response, the State initially argues that while Forbush did object to the request to have B.B. testify remotely, these particular arguments were not preserved. We disagree. When Trial Counsel objected to B.B.'s request to testify remotely, he focused much of his energy on the last-minute notice of the request. But in doing so, Trial Counsel also argued that there should have been "an evaluation conducted on B.B.," and he further argued that the request should be denied because "all we have is a bunch of speculation and a bunch of things that attorneys are saying" and that there was accordingly "no basis" for the proposed remote testimony. We regard these assertions as having been sufficient to preserve these arguments for appeal.

¶51 Moreover, the determinations at issue aren't the sort that would of necessity require expert assistance. Rule 15.5(b)(1) allows remote testimony based on a determination that either (i) "the child will suffer serious emotional or mental strain if required to testify in the defendant's presence," or instead (ii) "that the child's testimony will be inherently unreliable if required to testify in the defendant's presence." We can certainly envision situations in which a lay witness who is personally familiar with the child and the surrounding circumstances could offer meaningful testimony about the likely effects on this child of testifying in the defendant's presence. Indeed, in many such cases, testimony from someone who knows the child well may prove to be more probative of these issues than testimony from an outside expert. In short, we see no support (textual or otherwise) for reading an expert-testimony requirement into this rule that is not currently there.[13]

---

13. As something of an alternative corollary to this argument, Forbush suggests that in a case in which there was no expert evaluation, the lay witnesses should at least be required to testify that the child had "*actual fear*" of the defendant." (Emphasis in original.) But Forbush cites just a single Texas case to support that proposition—*Walker v. State*, 461 S.W.3d 599, 606 (Tex. App. 2015). And while there was some testimony of the children's "fear" in *Walker*, *see id.* at 605–06, it's not clear that the appellate court's descriptive reference to that fear was meant as an announcement of a prescriptive requirement moving forward. In any event, we again note that the text of our rule 15.5(b) doesn't require the court to make any determination of "actual fear." Rather, the rule requires a determination "that the child will suffer serious emotional or mental strain if required to testify in the defendant's presence, or that the child's testimony will be inherently unreliable if required to testify in the defendant's presence." Utah R. Crim. P. 15.5(b)(1). We see no basis for creating such an obligation in this case.

¶52    Second, Forbush argues that the evidence in this case was insufficient to support the determination that was required by the rule. Our supreme court has treated these determinations as fact findings that are not to "be reversed absent clear error." *Widdison*, 2001 UT 60, ¶ 60. And in assessing this question, we take "the evidence in a light *most favorable to the trial court's ruling*." *Id.* (emphasis in original, quotation otherwise simplified). Here, there was enough evidence to support the court's decision to allow B.B. to testify remotely and outside of Forbush's presence.

¶53    During the initial discussions about whether to allow this testimony to be taken remotely, the prosecutor informed the court that B.B. had told him that he didn't "particularly want to see" Forbush. The prosecutor then said that B.B. had "close[d] up quite a bit" when the prospect of testifying in front of Forbush was brought up. And the prosecutor added that he had observed a "noticeable change in attitude" when he had talked to B.B. about "being in the courtroom and the defendant being there." Continuing, the prosecutor said that B.B.'s unease with it was "very apparent physically," noting that when B.B. "becomes very, very uncomfortable, he diverts, and he becomes agitated."

¶54    Grandmother was then placed under oath and testified. In her testimony, Grandmother said that B.B. had been living with her since the previous summer. She said that B.B. "has difficulty answering questions in lots of different scenarios," to the point that "sometimes people will ask him what his name is, and he won't respond." She testified that B.B. has anxiety disorders and ADHD, both of which can make it harder for him to communicate, and that he had begun seeing "a psychologist actually because of this case and another incident." She also explained that B.B. is on medication to treat his conditions. Grandmother further testified that B.B. had shown specific reluctance to talk about the incidents in question with either prosecutors or in court proceedings. As one example, Grandmother said that a teacher recently had "a hard time getting" B.B. to leave the classroom when he was supposed to leave for a meeting with the prosecutor, and Grandmother said that when B.B. finally left the classroom for the meeting, he told her that he didn't "want to go."

¶55    Of note, the judge then asked Grandmother whether she thought it would "be very emotional for [B.B.] to have to testify here versus just testifying in a room without the jury, without the defendant." In response, Grandmother said that she thought it would be "frightening" for B.B. to testify in court in front of everyone and that she thought "he would be more comfortable in a smaller setting." She further explained that when B.B. gets frightened or nervous, he "sometimes" "gets angry," and she agreed that it can then become "difficult to engage him in a conversation."

¶56    So viewed, there was sufficient evidence to support the court's findings. At the outset, we note that this is not a case in which there was "*de minimis*" evidence of the kinds of "mere nervousness or excitement or some reluctance to testify" that might be common of many witnesses. *Widdison*, 2001 UT 60, ¶ 58 (quotation simplified). Rather, Grandmother testified about very particular mental and emotional conditions that B.B. has, and she further testified about the related and pronounced effects that stress and nervousness have on his ability to communicate about even ordinary subjects. This, alone, differentiates this case from cases involving testimony about more ordinary nervousness or reluctance.

¶57    The real point of dispute between the parties on appeal is whether there was any testimony to support a finding that testifying *in Forbush's presence* would cause either emotional or mental strain to B.B. or unreliability in his testimony. Here, we again note that we must view "the evidence in a light most favorable to the trial court's ruling." *Id.* ¶ 60 (quotation simplified). Under this deferential standard of review, Grandmother's testimony was sufficient. In addition to the testimony about B.B.'s conditions and general anxieties, Grandmother testified about B.B.'s specific reluctance to talk to people involved in the court system about the incidents at the heart of this case. And even more particularly, in response to a question from the court, Grandmother agreed that it would be "frightening" for B.B. to testify in front of Forbush and that B.B. "would be more comfortable" in a "smaller" setting. Viewed in

the light most favorable to the court's ruling, this was sufficient to support the required determination.[14]

## IV. Remote Testimony Implementation Issues

¶58    Forbush next raises several claims relating to how B.B.'s remote testimony actually transpired. First, Forbush argues that the court plainly erred by failing to inform B.B. that Forbush would be listening to B.B.'s testimony. Next, Forbush advances three interrelated ineffective assistance of counsel claims, faulting Trial Counsel for (1) failing to ensure that Forbush could

14. There's some question whether the court also meant to rely on the prosecutor's account of what B.B. had told him. In its oral ruling, the court referred to the "proffers" (plural) that had been "given earlier" about various conversations with B.B. Since Grandmother was the only witness who had been placed under oath, this suggests that the court was indeed referring to (and relying on) the prosecutor's statements. In his brief, Forbush makes a passing nod to the potential question of whether the prosecutor's account could actually be treated as testimony. But Forbush doesn't provide us with any authority showing that the court couldn't rely on this as an unsworn proffer, instead arguing that even the prosecutor's statements were insufficient to support the requisite findings. For its part, the State does place some reliance on the statements, referring to them as a "proffer[]" from the prosecutor.

     We have no need to determine whether these statements could be relied on as an evidentiary proffer. As noted, we think that Grandmother's testimony was sufficient. But if the prosecutor's statements are treated as an admissible proffer, they provide even more direct support for the findings in question. As noted, the prosecutor said that he had observed a "noticeable change in attitude" when he had talked to B.B. about "being in the courtroom and the defendant being there." And continuing, the prosecutor said that "it's been very apparent physically to me" that B.B. is uneasy about the situation.

communicate with him and could hear B.B.'s testimony; (2) failing to object when the judge offered to conduct a limited direct examination of B.B. after learning that the prosecutor's direct examination had been inaudible to the jury; and (3) failing to ask for additional cross-examination of B.B. after the court's additional questioning. We reject each of these claims for lack of prejudice.

### A. Failure to Inform B.B. that Forbush Could Hear His Testimony

¶59 Rule 15.5 states that a district court "shall advise" a child who is testifying outside the defendant's presence that "the defendant is present at the trial and may listen to the child's testimony." Utah R. Crim. P. 15.5(b)(1)(C). The record contains no indication that the court gave this information to B.B. before he testified remotely, and the record also contains no indication that Trial Counsel objected. While acknowledging that the issue is thus unpreserved, Forbush argues that the court committed plain error by not giving the information. We disagree.[15]

¶60 "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Johnson*, 2017 UT 76, ¶ 20, 416 P.3d 443 (quotation simplified). The harmfulness component of plain error review is "equivalent to the prejudice test applied in assessing claims of ineffective assistance of counsel." *Id.* ¶ 21 (quotation simplified). In the ineffective assistance context, it's settled that the defendant must

---

15. Preservation problems aside, the State suggests that under the presumption of regularity, we can infer that the information was given off the record. Forbush pushes back, asserting that such a ruling would stretch this presumption too far. We need not decide whether the presumption of regularity can indeed fill in a record gap like this one. Even if it's true, as Forbush asserts, that the warning was not given, we still reject Forbush's claim for lack of prejudice.

"demonstrate a reasonable probability that the outcome of his or her case would have been different absent" the error. *State v. Scott*, 2020 UT 13, ¶ 43, 462 P.3d 350.

¶61 Forbush makes various arguments about the prejudice that he allegedly suffered from the audio problems at trial. But Forbush never more particularly articulates how he was prejudiced by the court's failure to inform B.B. that Forbush would be listening to his testimony, and we see no basis for concluding that he was. We've been given no reason to believe that there was a reasonable probability that giving this information would have changed B.B.'s testimony at trial in any meaningful way. And we also note that while this argument is focused on the court's failure to give this information before B.B. testified during the trial, the jury also heard B.B.'s CJC interview, and that interview was recorded well before the trial testimony in question (meaning that it would have been unaffected by the missing rule 15.5 advisory at issue). Again, in that interview, B.B. made direct allegations of abuse against Forbush. On this record, we therefore see no basis for concluding that Forbush was prejudiced by this alleged error. The plain error claim fails.

B.    Ineffective Assistance Stemming from Implementation Issues

¶62 Forbush next raises a series of ineffective assistance claims stemming from various implementation issues relating to B.B.'s testimony. We reject these claims for lack of prejudice.[16]

¶63 Forbush first claims that, like the jury, he was unable to hear B.B.'s direct examination. He then points to Trial Counsel's

---

16. Forbush argues that these same implementation problems deprived him of his constitutional right to confrontation. But the record shows that Forbush was able to ask questions and raise concerns during the cross-examination of B.B. and that the jury heard this cross-examination. From this, we see no basis for concluding that Forbush's right to confront B.B. was violated.

decision not to ask for two-way telephonic communication during B.B.'s direct examination as contemplated by rule 15.5(b)(1)(D). Taken together, Forbush argues that two-way communication would have solved the problem in real-time, thereby allowing him to more meaningfully assist counsel before the cross-examination of B.B.

¶64  The State expresses skepticism about whether Forbush was indeed unable to hear the initial direct examination, and there is at least some reason to doubt Forbush's claim. Before B.B. began testifying, the bailiff informed the court that there was "volume and everything" in the room from which Forbush would hear the testimony. And Forbush did not report any trouble hearing this testimony at the time of trial, whether it be to the bailiff, his counsel, or the judge.[17] Moreover, while the record shows that Trial Counsel met with Forbush during the cross-examination,[18] Trial Counsel never said anything to the court about Forbush having any audio difficulties. It was only later at the rule 11(g) hearing when Forbush first made this claim. And even then, Trial Counsel testified that a speaker was turned on in the room so that Forbush could hear the testimony.

¶65  Regardless, we'll assume for purposes of argument that Forbush was unable to hear the direct examination. Because Forbush raises this as an ineffective assistance of counsel claim, we can reverse his convictions only upon a showing of both deficient performance and prejudice. Here, the record shows that Trial Counsel met with Forbush for about nine minutes, either

---

17. Forbush alleges the bailiff was absent from the room, but while the rule 11(g) court did not definitively resolve the dispute between the parties whether this was so, it did find that it would have been against district court policy to leave Forbush unattended.

18. As noted above, the court's minutes and the transcript both suggest that the break occurred during Trial Counsel's cross-examination of B.B.

before or, more likely, midway through the cross-examination. Even if Forbush was unable to hear the direct examination, Forbush had the opportunity at that point to learn from counsel what B.B. had said. On appeal, Forbush has not provided us with any basis for concluding that there was any inadequacy in counsel's discussion with him, or instead in the cross-examination of B.B that occurred either before or after that discussion.

¶66     From the record of these events as a whole, Forbush has not persuaded us that his earlier inability to hear the direct examination prejudiced him. Of note, Forbush was not hearing B.B.'s allegations for the first time at trial. B.B. had made those claims in the CJC interview, and Forbush was provided with that interview well before trial. Thus, Forbush clearly could have assisted his counsel before trial in the preparation of cross-examination. And in the context of this case, this advance preparation would likely have been more helpful anyway. As Forbush acknowledges in his appellate brief, B.B.'s direct examination at trial was relatively short (it spans just two pages of transcript), so the primary way that B.B.'s allegations were presented to the jury was through the CJC interview that Forbush had already reviewed.

¶67     Even with the benefits of further direct examination by the court at trial and two post-trial evidentiary hearings at which his prior attorneys testified, Forbush still does not argue that, if he had heard the direct examination in real-time, there was any particular question that he could have prompted Trial Counsel to ask that Trial Counsel didn't already ask, let alone a question whose answer would have meaningfully changed the evidentiary picture. Because of all this, we conclude that Forbush has not carried his burden of establishing prejudice on this claim.

¶68     Forbush's second and third ineffective assistance claims relate to what happened after the court learned that the jury was unable to hear B.B.'s direct examination. Forbush faults Trial Counsel for not objecting to the court's decision to ask certain questions of B.B. in something of a re-created direct examination,

and he also faults his counsel for not conducting an additional cross-examination after that questioning.

¶69     But even if there was deficient performance on these bases (points that we do not decide), we're not convinced that the failures prejudiced Forbush. The court explained at trial that after it had learned of the jury's audio difficulties during the original direct examination, it had "repeated" the "key questions" for the jury that the prosecutor had asked earlier. On appeal, Forbush asserts that the court framed some of its questions in a leading manner. But if Trial Counsel had objected to either the form of those questions or instead the overall procedure, the likely result would have either been reframed questions by the court or a new direct examination by the prosecutor. Forbush has given us no reason to believe that either outcome would have changed B.B.'s responses in a defense-helpful way.

¶70     With respect to the cross-examination claim, the record shows that the jury heard the original cross-examination of B.B. by Forbush's counsel. While Forbush now complains of Trial Counsel's decision not to ask for permission to conduct additional cross examination after the court's own questioning, he doesn't suggest that any question should have been asked that hadn't been asked before. As a result, his argument seems to be that counsel should have conducted the additional cross-examination in an effort to preserve the normal sequencing. This was of course an unexpected situation that the court and the attorneys alike were attempting to manage. But on this record, we're hard-pressed to conclude that the inversion of the usual sequencing norms affected the jury's assessment of B.B.'s testimony in any meaningful way.

¶71     In short, as with the other alleged errors relating to the remote testimony, we see no basis for concluding that Forbush was prejudiced. We accordingly reject these claims.

V. Ineffective Assistance Claims Subject to Rule 23B Findings

¶72     Contemporaneous with his appellate brief, Forbush filed a motion requesting a rule 23B remand for additional factual development on several ineffective assistance claims. We granted his request as to four of them. On remand, the district court held an evidentiary hearing at which seven witnesses testified, including Pretrial Counsel and Trial Counsel. After the court issued findings of fact relating to those claims, we invited the parties to submit supplemental briefs to address the impact of the new record and the court's findings on these additional ineffective assistance claims. "In a situation where the trial court has held a Rule 23B hearing and made specific findings relevant to an ineffective assistance of counsel claim, we defer to the trial court's findings of fact." *State v. Huggins*, 920 P.2d 1195, 1198 (Utah Ct. App. 1996); *accord Nelson*, 2015 UT 62, ¶ 11. "We then apply the appropriate legal principles to the facts and decide, for the first time on appeal, whether the defendant received ineffective assistance of counsel in violation of the Sixth Amendment." *Huggins*, 920 P.2d at 1198. For the reasons set forth below, we reject each of the additional ineffective assistance claims.[19]

A.     Failure to Impeach Forbush's Ex-Wife with a Prior Inconsistent Statement

¶73     L.T. was one of the two children that the State called under rule 404(c) to testify about additional abuse. In her CJC interview that was played for the jury, L.T. claimed that the abuse occurred when she was alone with Forbush while he was babysitting.

---

19. In our order, we denied Forbush's motion for a remand on several more ineffective assistance claims. One of those claims related to the rule 404(c) argument that we addressed (and rejected) above. With respect to the others, Forbush did not advance them in his opening brief as claims that could succeed without additional fact finding from a rule 23B remand. As a result, our prior order fully disposed of those claims and we have no need to address them further.

Forbush testified at trial that this was not possible because he was never alone with her. In its rebuttal case, the State called Forbush's ex-wife (Ex-Wife), who testified that she was "100% positive" that Forbush had been alone with L.T. while babysitting her.

¶74    Forbush's rule 23B motion pointed to a prior statement that Ex-Wife had made to police in which she said that Forbush "never watched" the girls alone. He thus claimed that Trial Counsel was ineffective for not impeaching Ex-Wife with this statement during the State's rebuttal. With the benefit of the findings from the 23B remand, we conclude that Trial Counsel did not perform deficiently by failing to put on this additional evidence.

¶75    As recounted in the 23B court's findings, Trial Counsel gave several reasons at the remand hearing for why he did not impeach Ex-Wife with this prior statement. First, Trial Counsel testified that he thought it "would be risky because for all he knew she might explain the inconsistency in a way that reflected poorly on Forbush." Second, he explained that his "strategy in relation to" the testimonies of both L.T. and B.C. "was to tread lightly and get them on and off the witness stand as quickly as possible to avoid repeated references to their abuse allegations." He accordingly "believed the impeachment approach" at issue in this claim "would have resulted in the jury hearing about [L.T.'s] abuse allegations over and over," thereby "undermin[ing] his strategy." And he further said that he thought that spending any additional time on issues relating to L.T. would distract the jury from focusing on his central theory, which was that it was Father, not Forbush, who had abused B.B.

¶76    When reviewing an ineffective assistance claim, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and we also "reconstruct the circumstances of counsel's challenged conduct . . . from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Moreover, there "are countless ways to provide effective assistance in any given case," and "even the best criminal defense attorneys would not defend a particular client in the same way." *Id.* (quotation simplified). For deficient performance

purposes, the "question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *State v. Wright*, 2019 UT App 66, ¶ 30, 442 P.3d 1185 (quotation simplified). In other words, the question "is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial. It is whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." *State v. Barela*, 2015 UT 22, ¶ 21, 349 P.3d 676.

¶77 Here, we agree with Forbush that some (perhaps even many) attorneys would have asked Ex-Wife about this prior statement. But Trial Counsel gave plausible reasons for his decision to avoid doing so—namely, he was worried that it might backfire, or instead that it might focus the jury on an issue that he didn't want the jury focusing on. Given these explanations, we do not believe that the approach chosen by Trial Counsel was so unreasonable that it constituted deficient performance. This claim thus fails.

B.    Failure to Investigate and Present Evidence of Ex-Wife's Credibility and Motive

¶78 In his rule 23B motion, Forbush faulted his attorneys for not investigating and then presenting evidence from either (i) a person that we'll refer to as Friend 1 or instead (ii) Forbush himself, each of whom, in Forbush's view, could have testified that Ex-Wife had a motive to falsely testify against him. We remanded for the development of such evidence.

¶79 In its ruling, the rule 23B court found that "[n]o evidence was presented" showing that Pretrial Counsel "was not aware of [Ex-Wife's] potential motivation to testify against Forbush." And the court also found that Trial Counsel discussed Ex-Wife and her animus toward Forbush with Forbush during a meeting before trial. We accordingly see no basis for concluding that either attorney was unaware of these potential issues.

¶80 With respect to Trial Counsel's decision not to present testimony about this from Friend 1, Forbush cannot show deficient performance. As recounted by the court in its findings, Friend 1 testified at the evidentiary hearing that Pretrial Counsel and Trial Counsel had both contacted him before trial about potentially testifying. But the court found that there were several reasons for Trial Counsel not to call Friend 1. The court found that Friend 1 "basically told" Forbush's attorneys "that he did not know much, he did not have much to offer, and he did not believe his testimony would be valuable at trial." In addition, Friend 1 also lived out of state at the time, and Friend 1 told Trial Counsel that he "could not testify" because he "was not around." While Friend 1 suggested at the remand hearing that he might have been able to testify if a timely subpoena had been issued, the court found this claim to be not credible. Moreover, the court also concluded that even if Friend 1 had somehow been compelled to testify, "his impartiality and motive to testify could have been challenged" based on his "relationship to Forbush."

¶81 With respect to the potential testimony about Ex-Wife, Friend 1 said at the 23B remand hearing that he thought Ex-Wife was "out to get Forbush." But he also said that he was "not certain about" this, and in any event, the district court noted that Friend 1 had "provided no basis" for his opinion. The court thus found that Friend 1 "knows little about [Ex-Wife] and does not know anything about her relationship with Forbush while she and Forbush were married." In light of Friend 1's lack of knowledge (both generally and about Ex-Wife in particular), Friend 1's potential bias, and Friend 1's apparent lack of availability, we cannot conclude that Trial Counsel performed deficiently by not presenting this testimony.

¶82 With respect to Forbush's own potential testimony on this issue, we see no deficient performance or prejudice. Again, Trial Counsel testified that he regarded Ex-Wife as a "non-material witness[]" and that, as a result, he believed that impeaching her would be "a side issue" that might direct the jury's attention away from "his central strategy, which was to convince the jury that Father," not Forbush, had abused B.B. We therefore have no basis

for second-guessing the decision not to ask such questions during Forbush's testimony. In addition, Forbush's claim at the evidentiary hearing was that Ex-Wife, Father, and L.T.'s mother had collectively "conspired against him." But the district court noted that Forbush had no evidence to support this theory, and it further noted that Forbush admitted that Ex-Wife actually "despised or had negative feelings toward" both of these alleged co-conspirators. All of this could have undermined the strength of any testimony from Forbush that the three had conspired against him. For this reason as well, we see no basis for concluding that there is a reasonable probability that introducing this testimony into the evidentiary picture at trial would have affected the outcome. It thus fails for lack of prejudice.

C.      Failure to Investigate and Present Testimony About Whether It Was Possible for B.B. and Father to Have Showered Together

¶83     As noted, B.B. first reported the abuse to Father. And according to Father's account, B.B. told him about the abuse while the two were showering together. At the time, B.B. and Father lived at the home of a person that we'll refer to as Landlord.

¶84     In his rule 23B motion, Forbush attached an affidavit from Landlord in which she averred that there was no shower in the basement where Father and B.B. lived and that it was "not possible" for the two to have showered upstairs together without her knowledge. We remanded for the development of additional evidence about whether Pretrial Counsel was ineffective for not investigating this further, as well as about whether Trial Counsel was ineffective for not presenting such evidence at trial. With the benefit of the findings from the remand, we conclude that neither attorney performed deficiently.

¶85     With respect to the investigation claim, Pretrial Counsel testified at the evidentiary hearing that he did investigate this issue by interviewing Landlord and asking her "whether or not there was a shower available in the basement." While Pretrial Counsel could not remember her exact answer, he testified that he

ultimately decided not to call Landlord at trial because of "potential bias issues" stemming from her prior relationship with Forbush. In light of this testimony, we see no basis for concluding that Pretrial Counsel failed to adequately investigate this potential testimony.

¶86 Turning to Trial Counsel's decision not to use the evidence about the shower at trial, Trial Counsel gave several reasons for this decision. He testified that he thought it was "insane" that B.B. and Father were showering together. He also testified that he believed this "was so, so shocking" that it actually "played to" what he thought was his "strongest defense": namely, that "Father abused [B.B.] when the two were showering together." In Trial Counsel's view, testimony from Landlord "or any other witness" that "Father and [B.B.] could not have showered together" would have "undermined" his theory. This chosen approach was a reasonable one, and we're not in a position to second-guess it. We therefore conclude that there was no deficient performance with respect to this decision.[20]

D.     Failure to Investigate and Present Character Evidence About Father

¶87 Finally, in his rule 23B motion, Forbush alleged that his prior attorneys failed to investigate and call various witnesses to testify about Father's reputation for dishonesty, his manipulative tendencies, and his substance abuse problems. Forbush claimed that both Landlord and Friend 1 could have offered such testimony; in addition, he claimed that such testimony could have come from a person that we'll refer to as Friend 2. We remanded

---

20. We also note that, at the evidentiary hearing, Landlord retracted her earlier assertion that it was "not possible" for B.B. and Father to have showered together without her knowledge, agreeing that there was a shower upstairs and that she was not always at home. Thus, even if Trial Counsel's approach to this issue was somehow unreasonable, this claim would fail for a lack of prejudice.

for further factual development on these claims, and with the benefit of that record, we reject each of them.

¶88     First, Landlord testified at the remand hearing. In its post-hearing findings, the district court concluded that the reasons she gave for believing that Father was dishonest were "indecipherable," and the court likewise pointed out that Landlord had provided no support for her beliefs that Father used drugs or had any mental illness. In addition, the court pointed to her "frustrating, costly, and negative history" with Father, which, in the court's view, would have allowed "her impartiality [to] have been challenged" had she been called as a witness. Given these findings, we see no basis for concluding that adding her potential attacks on Father's credibility would have meaningfully helped Forbush's case. There was accordingly no deficient performance in Trial Counsel's decision not to call her.

¶89     Second, at the evidentiary hearing, Friend 1 testified that he had told Pretrial and Trial Counsel that he didn't know much about Father's character for truthfulness. As noted above, the district court also found that Friend 1 had both availability and potential bias problems. In light of these findings, we see no basis for concluding that there was any deficient performance with respect to the failure to investigate or present Friend 1's potential testimony about Father's credibility.

¶90     Finally, with respect to Friend 2, the district court found that Forbush did not tell Pretrial Counsel about him. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions," and the question of "what investigation decisions are reasonable depends critically on such information." *Strickland*, 466 U.S. at 691. We therefore reject any assertion relating to Pretrial Counsel and Friend 2.

¶91     By contrast, Trial Counsel said that he did discuss Friend 2 with Forbush and that they particularly discussed Friend 2's potential testimony about Father's character and credibility. But Trial Counsel said that he decided not to call Friend 2 because

Friend 2 had a "potential bias" that "could be exploited by the prosecutor in a way that would not reflect well on Forbush." In light of this testimony, we cannot conclude that counsel performed deficiently for not calling Friend 2 at trial.[21]

## CONCLUSION

¶92    For the foregoing reasons, we affirm Forbush's convictions.

─────────────

21. At the close of his brief, Forbush asks us to reverse under the cumulative error doctrine. Under this doctrine, even if a court concludes that an individual error alone is not prejudicial, the court may still reverse if the "the cumulative effect of all the potentially harmful errors undermines its confidence in the outcome." *Suhail*, 2023 UT App 15, ¶ 153 (quotation simplified). Above, we've resolved many of the claims at issue for lack of prejudice. Even if we consider them cumulatively, we remain unconvinced that Forbush was prejudiced. We thus reject his cumulative error claim as well.